UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN RE CABLETRON SYSTEMS, INC. SECURITIES LITIGATION | C.A. 97-542JD (N.H.) C.A. 99-408S (R.I.) |

**JOINT DECLARATION OF CO-LEAD COUNSEL IN SUPPORT OF THE PROPOSED CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND PETITION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

WILLIAM C. FREDERICKS and HERB M. MILSTEIN hereby declare:

**INTRODUCTION**

1. Our firms, Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss") and Cohen Milstein Hausfeld & Toll, P.L.L.C. ("Cohen Milstein"), along with Stull, Stull & Brody ("Stull, Stull"), serve as Co-Lead counsel for Plaintiffs and the Class as defined below. We submit this Declaration in support of: (i) the proposed settlement (the "Settlement") of this litigation, consisting of the payment by Defendants of a total of $10,500,000 in cash, plus interest earned thereon (the "Gross Settlement Fund"); (ii) the proposed Plan of Allocation (the "Plan of Allocation"); and (iii) the application of Plaintiffs' Counsel for an award of attorneys' fees and reimbursement of expenses to be paid from the Gross Settlement Fund. As Co-Lead Counsel, our firms have actively participated in all aspects of this litigation, and we are familiar with the facts set forth in this Declaration.

2. We respectfully submit that the Court should approve the Settlement that was achieved after more than seven years of hard-fought litigation, which included numerous contested motions, Plaintiffs' successful appeal of the order granting Defendants' motion to dismiss this litigation, and the exceptionally difficult task of attempting to reconstruct events from millions of pages of incomplete accounting and other records. Plaintiffs achieved the Settlement notwithstanding substantial contested issues with respect to liability and damages,

and notwithstanding the substantial difficulties that arose from Plaintiffs not being permitted to commence any type of formal discovery during the first 5 ½ years of this action because of the stay of discovery mandated by the Private Securities Litigation Reform Act (the "PSLRA").

3. Although Co-Lead Counsel believe in the merits of this action, we were faced with the reality of Plaintiffs having to try this case against Defendants, including the former governor of New Hampshire, in a case in which many potentially pivotal documents were missing (including, *inter alia*, the emails of several of the Defendants), and in a case where certain key witnesses were not as forthcoming with favorable or detailed testimony as they had been more than seven years ago when those witnesses spoke informally to Plaintiffs' investigators. Given the gaps in the relevant documents, the faded or less sympathetic memories of key witnesses, and the complexities inherent in proving any §10(b) case for accounting fraud, litigating this action through trial would have been a difficult and risky task. In addition, Plaintiffs' Counsel were aware that defendants had only limited insurance coverage (which would continue to waste as litigation continued), and that Cabletron's successor entity (Enterasys, Inc.) had, as a result of continuing problems in the networking industry, far less ability to pay a large judgment in 2005 than it would have had in late 1997 when the case was first brought. Based on the foregoing, Plaintiffs' Counsel entered into protracted arms'-length negotiations with Defendants' counsel, and, based upon a realistic assessment of the risks of further proceedings, agreed to a settlement that we believe is in the best interests of Plaintiffs and the putative Class. Tellingly, despite Notice of the Settlement having been mailed to over 75,000 potential Class Members, no objections to the Settlement have been submitted.

4. This Declaration also addresses the Plan of Allocation. The Plan, which is set forth fully in the "Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees

and Settlement Fairness Hearing" (the "Notice") that has been mailed to members of the Class, reflects the fact that a substantial portion of the inflation in Cabletron common stock and call options, and of the artificial deflation in the price of Cabletron put options, was eliminated following negative partial disclosures about Cabletron's business affairs that Defendants made after the market closed on June 2, 1997, which was five months prior to December 2, 1997 (the last day of the Class Period), when plaintiffs allege that the full truth concerning the true state of the Company's deteriorating affairs was disclosed. That not a single Class Member has objected to the Plan of Allocation further evidences its fairness.

5. This Declaration is also submitted in support of Plaintiffs' Counsel's application for an award of attorneys' fees in the amount of 30% of the Gross Settlement Fund and reimbursement of $986,967.63 in litigation expenses plus interest at the same rate as accrued by the Gross Settlement Fund from the date of its inception through the date of payments. The requested 30% fee would result in an attorneys fee award of approximately $3.15 million, which is <u>less than half</u> the collective lodestar for just the three Co-Lead Counsel firms (which totals approximately <u>$8 million</u>), let alone for all of Plaintiffs' Counsel. Throughout the seven years of prosecuting this litigation, Plaintiffs' Counsel, working on a fully contingent fee basis, shouldered the risk of committing huge resources to the litigation and of working long hours in an intensely litigated matter, notwithstanding significant uncertainty as to whether the litigation would succeed.

6. For the reasons discussed below, it is respectfully submitted that the Settlement and proposed Plan of Allocation are fair and reasonable and should be approved, and that the requested fees and expenses are also fair and reasonable and should be awarded in full. The relevant authorities supporting approval of the Settlement and the requested fee are set forth in

the accompanying Memorandum of Law in Support of Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and in the separate Memorandum of Law in Support of Plaintiffs' Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Fee Memorandum").

## BACKGROUND AND HISTORY OF THE LITIGATION

### A. Initial Complaints and Consolidation

7. Beginning in October 1997, nine class action complaints (the "Initial Actions") were filed against Cabletron and its senior officers and directors in the United States District Court for the District of New Hampshire arising out of alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 3240.10b-5.[1]

8. On March 3, 1998, the Honorable Shane Devine, pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B), issued an Order: (i) consolidating the Initial Actions; (ii) appointing James G. Pettus, Larry Geisen, Lee Stein and Philip Adler as Lead Plaintiffs; and (iii) appointing Milberg Weiss and Stull, Stull as Co-Lead Counsel. The Court also Ordered that, upon the filing and granting of a motion pro hac vice, Cohen Milstein would also be appointed as additional Co-Lead Counsel. Shortly thereafter, on April 1, 1998, the Court appointed Cohen Milstein as an additional Co-Lead Counsel in this action.

[1] The first-filed of these Initial Actions was *Mesko v. Cabletron Syst.*, *et al.*, C.A. No. 97-542-SD.

## B. The First Consolidated Amended Class Action Complaint

9. On April 24, 1998, Plaintiffs filed a Consolidated Amended Class Action Complaint (the "First Consolidated Complaint") under Sections 10(b) and 20(a) of the Exchange Act in the District of New Hampshire against Cabletron and certain of its senior officers and directors.[2] The First Consolidated Complaint was brought on behalf of all persons who purchased the common stock of Cabletron, or who bought call options or sold put options in Cabletron common stock, between March 3, 1997 through December 2, 1997, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[3]

10. The First Consolidated Complaint alleged that, during the Class Period, Defendants engaged in a course of conduct that artificially inflated the market price for Cabletron securities. In sum, the Consolidated Complaint alleged that Defendants artificially inflated the price of Cabletron shares by engaging in an improper revenue recognition scheme and issuing a series of materially false and misleading financial statements and other misrepresentations concerning the Company's affairs during the Class Period. Plaintiffs also

---

[2] The Defendants are Cabletron and the following former top officers of the Company: S. Robert Levine ("Levine"), founder of the Company, and who was at all relevant times until August 6, 1997, the President, Chief Executive Officer and a Director of Cabletron; Craig R. Benson ("Benson"), Chief Operating Officer, Treasurer and Chairman of the Board; David J. Kirkpatrick ("Kirkpatrick"), Executive Officer, Director of Finance and Chief Financial Officer; Christopher J. Oliver ("Oliver"), Executive Officer, Director of Engineering and Manufacturing; Paul R. Duncan ("Duncan"), Member of the Board of Directors, and of the Board's Compensation Audit Committee; Donald F. McGuiness ("McGuiness"), member of the Board of Directors, and of the Board's Compensation and Audit Committee; and Michael D. Myerow ("Myerow"), Secretary, and a member of the Board of Directors and the Board's Compensation Committee (collectively the "Individual Defendants").

[3] Excluded from the Class are the Defendants, all of their officers, directors, partners, immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing have or had a controlling interest. Also excluded from the Class are the persons and/or entities who excluded themselves in accordance with the requirements set forth in the Notice, dated May 27, 2005.

alleged that five of the Individual Defendants profited from their alleged fraudulent conduct by selling $180 million of their own Cabletron stock at artificially inflated prices.

11. By Order dated December 23, 1998 (the "December 23 Order"), Judge Devine held that the First Consolidated Complaint violated the PSLRA's standards for "information and belief" pleading because it did not adequately "specify, as to each allegation, the facts that support Plaintiffs' belief," but granted Plaintiffs leave to replead.

**C. The Second Amended and Consolidated Class Action Complaint**

12. On January 22, 1999, Plaintiffs filed the Second Consolidated Amended Class Action Complaint (the "SAC").

13. The SAC expanded the allegations of the prior pleadings, and alleges that, among other things, Defendants caused Cabletron to engage in a variety of improper financial practices designed to hide the weakening demand for the Company's products and its deteriorating financial condition. These improper accounting practices -- none of which were publicly disclosed, and all of which were in violation of Generally Accepted Accounting Principles ("GAAP") -- included Defendants' improper recognition of tens of millions of dollars of revenue during the Class Period on fictitious sales of products to entities that either did not exist or had never ordered the Company's products.

14. The SAC also alleges that Defendants engaged in various illegal "inventory parking" practices, whereby they induced certain of its distributors and/or resellers to place orders for (or to accept delivery of) Cabletron products which they had not bona fide ordered. Furthermore, the SAC also alleges that Defendants improperly recognized revenue in violation of GAAP on de facto consignments to its distributors and resellers. These consignments or "consignment sales" were allegedly subject to essentially unlimited rights of return, whereby Cabletron promised its "buyers" that they could return the product at any time and for any

reason. The SAC alleges that such practices effectively permitted Cabletron to convert what otherwise would have been sharply increasing levels of unsold inventory into "sales" that Cabletron reported as revenue in violation of GAAP.

15. In addition to improperly recording revenue on fictitious sales and consignments subject to unlimited rights of return, the SAC alleges that Cabletron also violated GAAP by prematurely recognizing tens of millions of dollars worth of revenue on legitimate orders (when GAAP required that such revenue should not have been recognized until subsequent quarters), and by improperly recognizing revenue on shipments of product that Defendants knew was defective.

16. The SAC also alleges that Cabletron also manipulated its inventory in order to artificially deflate its reported quarterly costs. For example, the SAC alleges that during the Class Period incoming raw materials that should have gone straight to the stockroom were kept in trailers or on the Company's loading docks for weeks until the beginning of the next fiscal quarter to avoid being recorded as "received" on the Company's books.

17. The SAC alleges that Defendants' Class Period statements, which were disseminated to the public through, among other things, the Company's various financial statements, SEC filings and press releases, as well as through analysts' reports that were based on information provided by Defendants, were materially false and misleading. Among other things, the SAC alleges that these statements: falsely represented that Cabletron's financial statements were prepared in accordance with GAAP, when they were not; failed to disclose Cabletron's reliance on false sales orders, improper inventory parking schemes, and other fraudulent revenue-inflating activities; falsely represented that the Company's "SmartSwitch" products were ready for commercial production, when the Company knew that it was

experiencing several significant production problems that precluded any possibility of large-scale production until at least the Fall of 1997; and failed to disclose certain other material adverse factors that were facing the Company and adversely affecting its financial performance. Accordingly, the truth concerning Cabletron's weakened financial condition remained concealed.

18. The SAC alleges that after the close of the market on June 2, 1997, Cabletron announced that it expected revenues for the first quarter of its fiscal year 1998 to be only $360 to $370 million, with earnings per share of around $0.37 -- well below analysts' consensus estimates (based on Company guidance) of $0.49 per share. The Company also announced that it was experiencing unspecified "delays" in SmartSwitch "production availability." In response to this news, the price of Cabletron common stock fell $15.40 per share to $30.35 at the close of market on June 3, compared to its closing price of $45.75 the previous day.

19. The SAC alleges that Defendants' June 2, 1997 disclosures were only partial, and were themselves materially false and misleading and intended to continue to conceal the true extent of Cabletron's weakened condition. In the subsequent months, Cabletron began an aggressive public relations campaign to assure investors that it had contained its problems and was resuming its growth track.

20. The SAC alleges that on December 2, 1997, Cabletron stunned the market by announcing that its financial performance for the third quarter of FY 1998 would fall short of Company-induced market expectations, with revenues for the quarter falling to $330 to $340 million and earnings falling to $0.08 to $0.12 per share. The Company also announced that it would take a one time charge against earnings of between $25 and $30 million to "realign" its business. In response to these disclosures of the extent of the decline in Cabletron's financial

condition and performance, the Company's stock price fell another 32% to $15.6875 on heavy trading, representing a total decline of nearly 67% from the stock's Class Period high of $46.50.

21. By Order dated February 4, 1999, Judge Devine held that the SAC met the PSLRA's requirements relative to pleadings based on information and belief, as set forth in his December 23 Order, and gave Defendants ten days either to renew their motion to dismiss or file an answer.

22. On the same day that the District Court rendered its February 4, 1999 Order, Defendants moved to strike the SAC for its alleged failure to comply with the District Court's December 23, 1998 Order. After receiving Judge Devine's February 4, 1999 Order, Defendants moved for reconsideration of that Order, and filed a renewed motion to dismiss on April 13, 1999.

23. Before he could rule on Defendants' Motion to Reconsider, Judge Devine died on February 22, 1999, and the case was reassigned to the Honorable Joseph A. DiClerico, Jr.

24. On April 15, 1999, Judge DiClerico issued an Order sua sponte directing not only Co-Lead Counsel, but also every other plaintiff law firm in the case (approximately 25 firms), to submit a list of every active class action "against any corporation involving federal securities laws in which counsel or their firms appear on behalf of any party or class." Upon review of the lists submitted by counsel, on August 17, 1999 Judge DiClerico recused himself.

25. On August 19, 1999 the clerk of the District Court of the District of New Hampshire transferred this case a second time, where it was assigned to the Honorable Ernest C. Torres of the District of Rhode Island, on the grounds that all of the judges in the District of New Hampshire had recused themselves. The transfer order provided that jurisdiction would nonetheless remain with the District Court of New Hampshire.

26. On January 18, 2000, Chief Judge Torres requested that counsel again "submit a list of all active class actions against any corporation in which [counsel or their firms] represent the class." After reviewing these submissions, on June 15, 2000, Chief Judge Torres (like Judge DiClerico before him) recused himself from the case, even though he had no interest in Cabletron or this case. The case was then reassigned to its fourth judge, the Honorable Mary M. Lisi.

27. As a result of the succession of recusals discussed above, all discovery continued to be stayed and oral argument on Defendants' motion to reconsider Judge Devine's February 4, 1999 order concerning the adequacy of the complaint and Defendants' renewed motion to dismiss (filed April 13, 1999) was not held until November 7, 2000. At oral argument, Judge Lisi -- notwithstanding Judge Devine's February 1999 Order holding that Plaintiffs had complied with the PSLRA's requirement for pleading on information and belief -- requested that Co-Lead Counsel identify in writing which paragraphs in the SAC were alleged on "information and belief." Judge Lisi defined "information and belief" to exclude allegations based upon facts provided to Plaintiffs by a former employee if the former employee had knowledge of the facts alleged.

28. In response to Judge Lisi's Order, on November 13, 2000, Plaintiffs filed a Submission Regarding Allegations in the SAC with the District Court that identified the only four paragraphs of the SAC that were based on information and belief as defined by the Court.

29. Nevertheless, by Order dated May 23, 2001, Judge Lisi granted Defendants' motion to dismiss. Among other things, the Court found that the SAC's allegations concerning Defendants' improper revenue schemes were not based on sufficient factual particulars as required by Rule 9(b), and that Plaintiffs did not allege specific facts to provide a basis for their

belief that any alleged misstatements in revenue made by Cabletron were "material." In addition, the Court found that Plaintiffs failed to plead the specific facts required by Rule 9(b) and the PSLRA to hold Cabletron liable for the statements of market analysts. Finally, Judge Lisi also held that the SAC did not sufficiently plead scienter against the Defendants, despite Plaintiffs' allegations that Individual Defendants Levine, Kirkpatrick, Duncan, McGuiness and Myerow had sold $180 million of Cabletron stock during the Class Period.

**D. Plaintiffs' Successful Appeal to the First Circuit**

30. On June, 18, 2001, Plaintiffs filed their Notice of Appeal of the District Court's dismissal with the United States Court of Appeals for the First Circuit.

31. On November 12, 2002, the First Circuit reversed Judge Lisi's Order dismissing the SAC, finding that the SAC met the heightened pleading standard set forth in the PSLRA, as well as all other applicable pleading requirements. *In re Cabletron Sys., Inc. Sec. Litig.*, 311 F.3d 11 (1st Cir. 2002).[4] Among other things, the First Circuit held that "there was sufficient detail in the allegations," and that "the [SAC] provides adequate information concerning internal company documents on which it relies." *Id.* at 21. In sustaining the SAC's allegations that Defendants were also liable for materially misleading statements made by market analysts, which were allegedly based on statements made by Defendants, the First Circuit "reject[ed] the district court's determination that the defendants must have either 'controlled' the content of the third party statements or adopted them" in order to be liable for such statements *Id.*

32. With respect to scienter, the First Circuit further held that "[t]aking the allegations of the complaint as a whole -- and as true -- we find that it is not only a reasonable inference but

---

[4] The First Circuit affirmed only the dismissal of the Section 10(b) claim against defendant Oliver.

a strong one that defendants possessed a state of mind giving rise to a securities fraud claim, if a fraud was committed." *Id.* at 40. Among other things, the First Circuit found that the insider trading allegations "combine with other aspects of the [SAC] to produce a strong inference of scienter overall." *Id.*

33. Finally, the First Circuit noted that its holding that the SAC was sufficient "returns the case to the district court, which ultimately will resolve the broader issues of culpability," and added that "on remand, the district court may, in its discretion, limit or structure discovery so that potentially dispositive issues are addressed first."

34. On December 2, 2002, the Action was transferred to the calendar of Judge William E. Smith of the District of Rhode Island.

**E. Discovery**

**(i) Plaintiffs are Permitted to Conduct Limited Document Discovery**

35. In light of the First Circuit's Decision, Plaintiffs believed that they would be permitted to commence formal discovery, which, up until that time (*i.e.*, five years after the Initial Actions were filed), had been stayed pursuant to the PSLRA. However, on January 17, 2003, Defendants filed a motion for limited expedited discovery and a protective Order, under which Defendants alone could conduct unilateral discovery for the purpose of once more trying to challenge the SAC. Among other things, Defendants sought to stay all Plaintiffs' discovery until Defendants were provided with the identities of the anonymous sources set forth in the SAC, and then had the opportunity to depose those sources. In response, Plaintiffs argued that, after five years of litigation over the pleadings, it was imperative that Plaintiffs be allowed to immediately conduct general discovery. In addition, because a number of Plaintiffs' confidential sources had advised Plaintiffs that they were reluctant to come forward inasmuch as one of the defendants, Mr. Benson, had recently been elected Governor of New Hampshire, Plaintiffs

argued that depositions of such reluctant sources should, at a minimum, be deferred. Accordingly, Plaintiffs proposed an alternative discovery plan that would allow both Plaintiffs and Defendants to proceed with discovery.

36. On March 18, 2003, Magistrate Judge Robert W. Lovegreen issued an order (the "Limited Discovery Order") that granted in part and denied in part Defendants' motion for unilateral discovery. With respect to anonymous source depositions, the Limited Discovery Order stated that "[t]his court will refrain at this time from ordering the plaintiffs to produce the names, etc. of all anonymous sources as some may decline to testify or may have a valid reason why their anonymity should currently be preserved," but noted that "unless the names, etc. are forthcoming, the likelihood of unnamed witnesses testifying at trial may be very remote."

37. With respect to Plaintiffs' requests to take discovery, the Limited Discovery Order permitted Plaintiffs to obtain from the Defendants any documents in Defendants' possession having relevance to the proof of the fraud. However, under the Order, Plaintiffs were not permitted to: (i) take sworn testimony of any Individual Defendant, former Cabletron customers, or Cabletron's auditors; (ii) serve any written interrogatories; or (iii) subpoena documents in the possession of any third party.

38. On April 1, 2003, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiffs and Defendants exchanged Initial Disclosure Statements. On April 11, 2003, Plaintiffs served Defendants with Plaintiffs' First Request for Production of Documents, which included 25 separate requests (and multiple sub-requests), including, among other things, requests for the production of accounting records and sales order files that were relevant to the SAC's allegations.

39. On May 6, 2003, Defendants took the deposition by oral examination of Timothy Smith, who, pursuant to the Limited Discovery Order, Plaintiffs had identified as a potential trial witness. Among other things, Mr. Smith, who was employed by Cabletron as a "loading dock receiver" and worked at its Rochester, New Hampshire facility from May 1994 through May 1997, testified that Cabletron regularly "shipped" large volumes of product at quarters' end to trailers parked in Cabletron's parking lot that never left Cabletron's premises. In addition, Mr. Smith testified that he would process these goods as returned merchandise in the days immediately after the next fiscal period had begun. In fact, Mr. Smith testified that the volume of "shipped" Cabletron product that had never left the premises was so great during fiscal 1997 (the financial statements that the SAC alleged were fraudulently inflated) that it would sometimes take him as long as two or three days to receive it all back.

40. On May 12, 2003, Defendants served their responses to Plaintiffs' First Request for Production of Documents. Thereafter, as discussed more fully below, between May 2003 and June 2004, Defendants produced or made available for Plaintiffs' review approximately 5 million pages of paper documents, as well as certain electronically maintained accounting databases. Although the production contained significant holes (especially in the Company's accounting records, which were highly relevant to the SAC's allegations), Plaintiffs believe that the materials that Cabletron produced confirmed the existence of tens of millions of dollars worth of highly suspicious "sales" transactions that were consistent with the SAC's allegations that Defendants engaged in accounting fraud during the Class Period.

- **Hard-Copy Document Discovery**

41. In May and June 2003, Plaintiffs' Counsel began reviewing documents at Enterasys's Rochester, New Hampshire warehouse.[5] Defendants produced approximately 1,200 oversized boxes of documents (constituting approximately 5 million pages and filling approximately the area of half a football field). However, although Defendants claimed that these documents were organized according to the categories set forth in Plaintiffs' document requests, the documents were, in fact, produced in a scrambled manner and "organized" into only a handful of "categories." For example, "complete" sets of related accounting records and documents were not produced together in a coherent fashion, but were scattered in boxes through the entire production. Plaintiffs' Counsel were therefore forced to spend approximately 100 hours reorganizing Defendants' document production on site in Cabletron's document warehouse before they could even commence a serious review of the boxes' contents.

42. On July 16, 2003 -- barely two months into the document review process -- Defendants informed Plaintiffs that they had unilaterally terminated, effective immediately, Plaintiffs' further access to the 5 million pages of documents that had been produced at the Rochester, New Hampshire warehouse. On that same day, Defendants filed a "renewed" motion to dismiss.

43. In response, by letter dated July 23, 2003 Plaintiffs: (i) informed the Court of Defendants' unilateral termination of discovery, (ii) argued that the filing of Defendants' "renewed" motion to dismiss prior to the completion of limited discovery appeared to be a

---

[5] On August 6, 2001, Cabletron went through a corporate reorganization and changed its name to Enterasys Networks Inc.

violation of the Court's standing Limited Discovery Order, and (iii) requested a conference at the Court's earliest convenience.

44. On August 11, 2003, the Court held a conference at which it agreed that Defendants' termination of discovery and filing of a "renewed" motion to dismiss were both improper. The Court also instructed Defendants, among other things: (i) to immediately restore Plaintiffs' access to the document repository in New Hampshire; (ii) and to produce copies of documents that Plaintiffs had designated previously for copying, but which Defendants had been withholding since June 2003.

45. In light of the Court's Order, Plaintiffs' Counsel reassembled its document review team, which maintained a virtually continuous presence reviewing Defendants' document production in New Hampshire from mid-August through mid-October 2003.

46. In December of 2003, Plaintiffs returned to Rochester, New Hampshire, among other things, to finish their initial review of the hard-copy documents located at Cabletron's warehouse. In May 2004, Defendants also produced additional documents that they had purportedly just located.

- **Electronic Discovery**

47. In addition to the hard-copy document production, during Limited Discovery Defendants also produced various electronic data-files, which included information from Cabletron's accounting databases that Defendants used immediately prior to and during the Class Period, as well as information from the Company's General Ledger.

48. Nevertheless, although Cabletron produced a huge volume of accounting data (amounting to untold millions of separate pieces of information) on a series of computer disks, the raw data was in a form that needed to be sorted and analyzed with specialized software in order to be intelligible.

49. In light of the complexities of extracting the data that Defendants produced electronically, Plaintiffs retained experts to access and format this data. In addition, after numerous consultations between and among Plaintiffs and their forensic computer experts and forensic accounting experts, Plaintiffs purchased a specialized commercial software package designed especially to assist in the auditing or review of large accounting databases. Plaintiffs also retained multiple vendors to assist in extracting useful information from Defendants' electronic database productions.

50. Despite these significant efforts and cost, Plaintiffs still believed that there were gaping holes in the electronic data files. For example, upon a thorough and lengthy review of the accounting databases, it appeared that Defendants' electronic production did not include complete data with respect to product returns and payment (or non-payment) information that directly related to transactions that originated during or immediately prior to the Class Period.

51. During Limited Discovery, Plaintiffs also negotiated with Defendants over the production of e-mails and other user-created electronic documents that were responsive to Plaintiffs' document requests. On December 23, 2003, after lengthy negotiations between Plaintiffs and Defendants, the parties (in consultation with their respective computer forensic experts) informed the Court that they had reached an agreement on a protocol for the restoration and review of a sample-set of e-mails and other user-created electronic documents from six back-up tapes.

52. However, Defendants informed Plaintiffs that its email back-up tapes did not contain e-mail mailboxes for two of the key individual defendants, Craig Benson (Cabletron's former CEO and, until recently, the Governor of New Hampshire) and Robert Levine (Cabletron's former president), as well as Steven Tentindo, another individual that Plaintiffs

identified as a witness, and that no other back-up copies of these potentially critical email documents existed. Accordingly, although the restoration of e-mail back-up tapes produced some additional documents relevant to proof of fraud, the e-mail record as a whole was frustratingly incomplete.

53. In sum, between reviewing the mass of "paper" documents in Cabletron's New Hampshire warehouse and reviewing the partially restored electronic data from Cabletron's accounting systems, Plaintiffs were forced to spend millions of dollars' worth of attorney time and expense trying to put together a documentary puzzle which they believed was missing a very large number of pieces.

**(ii) Plaintiffs are Permitted to Conduct General Discovery**

54. On June 30, 2004, more than 6 ½ years after the Initial Actions were filed, the Court issued an Order (the "Discovery Order"), that, among other things, permitted Plaintiffs to conduct "full discovery." Promptly thereafter, Plaintiffs served discovery on KPMG LLP ("KPMG"), Cabletron's auditor during the Class Period, and on thirty of the Company's Class Period customers, resellers, and distributors.

- **Discovery From KPMG**

55. Plaintiffs subpoena on KPMG sought, *inter alia*, a complete set of KPMG's workpapers relating to its class period audits of Cabletron. Following various negotiations with KPMG over the scope of Plaintiffs' subpoena, KPMG produced, and Plaintiffs' Counsel accounting experts reviewed several thousand pages of workpapers.

- **Non-Auditor Third-Party Discovery**

56. In July 2004, Plaintiffs also served document subpoenas on 26 of Cabletron's customers, resellers, and distributors ("customers"). Co-Lead Counsel selected these customers based on their analysis of these entities' transactions with Cabletron, which indicated that some

or all of those customers' dealings with Cabletron were suspect based, *inter alia*, on evidence of large end-of-quarter "sales" that were subsequently returned and reversed.

57. The responses by the customers to those subpoenas varied in terms of compliance. For example, because the transactions at issue in this litigation were 7 to 8 years old at the time the subpoenas were served, many customers represented that it was difficult or impossible to locate responsive documents, and several customers represented that they were unable to find any responsive documents. Nevertheless, certain of the third parties did produce materials that either corroborated Plaintiffs' central allegations concerning Defendants' fraudulent transactions (*e.g.*, information evidencing "sales" that were subject to unlimited rights of returns, in violation of GAAP), or were consistent with these allegations.

58. Pursuant to the Discovery Order, in November and December 2004, Plaintiffs also issued several Rule 30(b)(6) deposition subpoenas to a number of third parties concerning, among other things, their transactions with Cabletron during the Class Period. The proposed Settlement was achieved before the dates for these depositions.

- **Additional Discovery From Defendants**
  - *Hard-Copy Documents*

59. Pursuant to the Discovery Order, in August 2004, Plaintiffs' Counsel, along with Plaintiffs' Counsel's accounting experts, returned to Defendants' Rochester, New Hampshire warehouse to re-inspect files relating to suspect transactions that Plaintiffs had identified through their analysis of Defendants' accounting databases and KPMG's audit workpapers.

  - *Depositions of Former Cabletron Employees and the Individual Defendants*

60. Pursuant to the Discovery Order, Plaintiffs were permitted to take the deposition of five former or current Cabletron employees (in addition to the Individual Defendants). In

November 2004, Plaintiffs deposed two former Cabletron employees, Steven Tentindo (head of Cabletron's sales until March 1997), and Gayle Spense (director of internal sales at Cabletron and later, at Enterasys). Co-Lead Counsel believed, through information obtained by their own investigation and information produced during discovery that these two individuals had worked closely with the Individual Defendants and had first-hand knowledge about the facts alleged in the SAC.

61. In fact, in May 2004, 6 ½ years after this action was commenced, the Department of Justice (the "DOJ") indicted Ms. Spense and two other company officials for their involvement in an improper revenue recognition scheme at Cabletron's successor company during 2001, that mirrored the one alleged in this litigation, and Ms. Spense later pled guilty to conspiring to fraudulently inflate the Company's reported revenue during 2001.

62. Plaintiffs also issued deposition notices for the Individual Defendants, including defendant Benson, who at that time was the sitting Governor of New Hampshire. Although Plaintiffs had prepared to take the depositions of these individuals, as well as of certain other former Cabletron employees, the parties reached the proposed Settlement prior to the depositions.

- **Interrogatories and Supplemental Document Requests**

63. In light of the disarray and gaps in Cabletron's production, as well as the fact that so many third parties had either lost or destroyed a large number of documents (from 1996 and 1997) that Plaintiffs sought through document subpoenas, on October 12, 2004, Plaintiffs served their First Set of Interrogatories, Requests for Admissions and Supplemental Document Requests on Defendants to obtain information concerning suspect transactions that Plaintiffs had identified to date.

64. Defendants had asserted previously that, in most cases, the information that Plaintiffs sought could be extracted from voluminous electronic databases of information that had been produced in electronic format. Plaintiffs disputed Defendants' contention. Plaintiffs' interrogatories sought printouts of basic accounting information and data that Plaintiffs believed were fundamental to the issues in this action but which Defendants had refused to produce.

65. In November 2004, Defendants served their responses to Plaintiffs' Interrogatories, in which they refused to provide answers to 12 of Plaintiffs' 15 Interrogatories. Accordingly, on December 30, 2004, Plaintiffs filed a motion to compel Defendants to answer Plaintiffs' Interrogatories (which was filed in conjunction with Plaintiffs' motion to compel Defendants to designate a 30(b)(6) witness).

- **Anonymous Sources**

66. Because of the extensive gaps in both the paper and electronic document record in this case, including the absence of complete accounting records regarding product returns and the fact that the e-mails of various key individuals (including the e-mails of both the Company's former CEO and its former president) had been not been preserved, Plaintiffs' Counsel recognized that the testimony of individual witnesses would likely assume enhanced significance in terms of proving their claims of fraud.

67. Although previously anonymous witness Timothy Smith had been identified in 2003 and had given (as noted earlier) testimony helpful to Plaintiffs on a variety of issues, discovery of Plaintiffs' "anonymous sources" began in earnest in the late summer and fall of 2004 after Plaintiffs, in accordance with the Court's July 15, 2004 Discovery Order, identified an additional 28 witnesses who had previously provided Plaintiffs with information that was corroborative of the Complaint's allegations. Of these 28 witnesses, all were subpoenaed to testify by Defendants. However, in lieu of testifying, Defendants apparently gave each witness

the opportunity to submit a written affidavit instead. Accordingly, of the 28 additional anonymous sources identified by Plaintiffs, 23 apparently avoided being deposed in exchange for submitting narrowly tailored affidavits that were apparently drafted by (or with the substantial assistance of) Defendants' Counsel, and only 5 anonymous sources (who refused to provide written statements) were actually deposed. These depositions all took place in October 2004.

68. Significantly, many if not most of the witnesses who testified by deposition or by affidavit in 2004 did not deny that they had heard rumors of improper revenue recognition activities at Cabletron, and were aware of (or had heard of) large product returns that were a critical aspect of Plaintiffs' proof. However, whether due to the passage of time, or to the lack of surviving documents (including e-mails) that could be used to refresh recollections, or to the apprehension that many witnesses had previously expressed about giving testimony that could be perceived as adverse to Governor Benson, generally speaking the anonymous sources who gave deposition testimony were unable (or unwilling) to provide non-hearsay evidence that would have been admissible in court to prove that any senior Cabletron officer was a knowing participant in a scheme to defraud. In short, these witnesses were in general able to provide less fulsome testimony and fewer specifics when testifying in 2004 about specific transactions and events than they had when Plaintiffs' Counsel (or their investigators) had first interviewed them as many as six or more years earlier.[6]

[6] For example, Defendants submitted the affidavit of witness C.A., a former Cabletron employee who worked at the Company's Rochester, New Hampshire offices from 1996 through December 1997. Mr. A's Affidavit stated, among other things: "I have a vague memory of rumors regarding products being shipped to customers who did not order the product. However, I do not remember the specifics of those rumors, I do not recall how or when I heard of them, and I do not know of any facts to substantiate those rumors."

69. The affidavits submitted by the other 23 anonymous source witnesses contained even less direct evidence of fraud (which was not surprising inasmuch as these affidavits were presumably prepared by or with the assistance of Defendants' counsel, who presumably offered the witnesses the attractive opportunity of foregoing a deposition if they instead simply signed an affidavit). However, even some of these affidavits noted that the witness was aware of stories of allegedly improper revenue recognition activities, and information provided in those affidavits about certain transactions (*e.g.*, "stocking order" transactions) was not inconsistent with Plaintiffs' allegations, and might have led to even more helpful information had Plaintiffs' been able to cross-examine these witnesses under oath. Nonetheless, the sobering reality of the situation from Plaintiffs' perspective was that the majority of witnesses whom Plaintiffs hoped would provide the strongest testimony for their claims were -- with the passage of time and in the absence of a fuller documentary paper trail -- at best only able to support a circumstantial case of fraud against the Individual Defendants, and the "inner circle" of senior Cabletron managers (such as Gayle Spense and Steve Tentindo) who had worked most closely with one or more of the Individual Defendants (and who more junior employees had indicated would "know where any bodies were buried") ultimately refused to incriminate the Defendants as knowing participants in a fraudulent scheme.

**F. Settlement Negotiations**

70. Settlement discussions were held at various times during the course of the litigation, beginning in January 2002. Not surprisingly, the parties' early discussions revealed that the parties held widely different views with respect to the merits of the case and potential damages. Defendants also informed Plaintiffs that Cabletron's first two levels of insurance were, respectively, for $10 million each. The policies were both wasting policies. Moreover,

Cabletron's third level of insurance was unavailable as the insurer for that layer was in receivership.

71. Although Plaintiffs and the Defendants had periodic settlement discussions throughout the course of this litigation, the intensity of the settlement discussions increased in November and December 2004. During this period, Co-Lead Counsel and Defendants' counsel had numerous telephone conversations, and met personally in Defendants' counsels' Boston offices in November 2004. During these discussions, Defendants' counsel alerted Co-Lead Counsel that the first two policies of insurance only had approximately $15 million left in combined coverage (of the original $20 million total) because part of the coverage had been applied to another, unrelated action, and because Defendants' counsel's fees and costs that had already been charged against the policies.

72. On January 7, 2005, Plaintiffs and the Defendants agreed in principle to settle Plaintiffs' claims against the Defendants for $10,500,000, with interest beginning to accrue on the funds two business days after the Preliminary Approval Order was signed. In determining that the Settlement constituted a material benefit to the Class, Co-Lead Counsel, in addition to taking into account the numerous risks of continuing to litigate this matter, also recognized that Defendants' insurance coverage was steadily declining, and that the Company itself had very little cash, and overall was not in a very strong financial condition.

73. On April 19, 2005, Plaintiffs and the Defendants entered into a formal Stipulation and Agreement of Settlement (the "Settlement Stipulation"), which the Court approved on May 13, 2005 (the "Preliminary Approval Order").

**SUMMARY OF THE CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

74. In full and complete settlement of the claims that have or could have been asserted against the Defendants in this action, and subject to the terms and conditions of the

settlement agreement, the Defendants have paid into escrow the cash sum of $10,500,000, the corpus of which ($10 million) has been earning interest (as of May 16, 2005) for the benefit of the Class.

75. Upon the Court's final approval of the Settlement, Plaintiffs and members of the Class will release, and shall be enjoined from prosecuting, Defendants and related parties for all claims that were or could have been asserted in the litigation.

76. The Gross Cash Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed on a pro rata basis, as described in the Plan of Allocation discussed below, to members of the Class who submit timely and valid Proofs of Claim. Class Members have until September 19, 2005 to file valid and timely proofs of claim in Order to participate in the Settlement.

77. The proposed Plan of Allocation, as set forth in the Notice mailed to the members of the Class, reflects Plaintiffs' evaluation of the strengths and weaknesses of the claims of Class Members. Each claimant's pro rata share of the Net Settlement Fund shall be based upon the claimant's Recognized Claim from transactions during the Class Period.

78. The Plan of Allocation and the "Recognized Claim" formulae were prepared in such a way as to fairly allocate the recovery among Class Members in accordance with Plaintiffs' theories of damages in the action. Thus, as set forth in detail in the Notice, the Plan of Allocation allows claims to be "recognized" based on the assumption that Class Members who bought Cabletron securities during the Class Period paid an artificially high price for those securities. To the extent that a Class Member sold the securities at a still inflated price, the Recognized Claim is reduced under the Plan.

79. The alleged amount of artificial inflation (and deflation in the case of put options) for each security and for each day during the Class Period are also set forth in the Notice mailed to the members of the Class. The formulae take into account the limitations on damages imposed under the PSLRA. "Recognized Claims" will be calculated under the following formulae for purposes of the Settlement as follows:

<u>Common Stock Purchases</u>:

(i) For shares of Cabletron common stock purchased during the period March 3, 1997 through June 2, 1997, inclusive, and

> (a) Sold at a loss on or before June 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim," (since it is assumed that the amount of inflation at the time of the purchase was the same as the amount of inflation at the time of the sale);
>
> (b) Sold at a loss during the period June 3, 1997 through December 2, 1997, inclusive, an Authorized Claimant's "Recognized Claim" shall mean the lesser of: (a) $15.50 per share (i.e. the $23 per share maximum inflation, less the remaining $7.50 that the Class Member received by selling before December 3, 997), or (b) the purchase price paid (including commissions, etc.) (the "PPP") less the sales proceeds received (net of commissions, etc.) (the "SPR") (limiting the Recognized Claim to no more than the actual out-of-pocket loss incurred on the purchase and sale);
>
> (c) Sold at a loss during the period December 3, 1997 through March 2, 1998 (90 days following December 2, 1997), inclusive, an Authorized Claimant's "Recognized Claim" shall mean the lesser of: (a) $23.00 per share (the full amount of the maximum inflation amount), or (b) the PPP less the SPR;
>
> (d) Held as of the close of trading on March 2, 1998, an Authorized Claimant's "Recognized Claim" shall mean the lesser of: (a) $23.00 per share, or (b) the PPP less $14.77 (limiting the Recognized Claim to the difference between the purchase price and the average price of the stock for the 90 day period after the end of the Class Period).

(ii) For shares of Cabletron common stock purchased during the period June 3, 1997 through December 2, 1997, inclusive, and

> (a) Sold at a loss on or before December 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim";
>
> (b) Sold at a loss during the period December 3, 1997 through March 2, 1998, inclusive, an Authorized Claimant's "Recognized Claim" shall mean the lesser of: (a) $7.50 per share, or (b) the PPP less the SPR;

(c) Held as of the close of trading on March 2, 1998, an Authorized Claimant's "Recognized Claim" shall mean the lesser of: (a) $7.50 per share, or (b) the PPP less $14.77.

Call Option Purchases:

(i) For Cabletron call options purchased during the period March 3, 1997 through June 2, 1997, inclusive, and

(a) not owned as of the close of trading on June 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim";

(b) owned as of the close of trading on June 2, 1997, an Authorized Claimant's "Recognized Claim" shall mean 50%[7] of the difference, if a loss, between (x) the amount paid for the call options (including commissions, etc.) and (y) the sum for which such call options were subsequently sold at a loss (net of commissions, etc.) (or $0.00 if the call option expired while still owned by the Authorized Claimant).

(ii) For Cabletron call options purchased during the period June 3, 1997 through December 2, 1997, inclusive, and

(a) not owned as of the close of trading on December 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim";

(b) owned as of the close of trading on December 2, 1997, an Authorized Claimant's "Recognized Claim" shall mean 50% of the difference, if a loss, between (x) the amount paid for the call options (including commissions, etc.) and (y) the sum for which such call options were subsequently sold at a loss (net of commissions, etc.) (or $0.00 if the call option expired while still owned by the Authorized Claimant).

(iii) For Cabletron call options purchased during the Class Period that were exercised by the Authorized Claimant, the Authorized Claimant's "Recognized Claim" shall be calculated as set forth above under "Common Stock Purchases," and as if the exercise of the call option were instead a purchase of Cabletron common stock on the date of exercise of such call option, and the "purchase price paid" shall be the strike price plus the amount paid for the call option (including commissions, etc.);

(iv) No Loss shall be Recognized based on a sale or writing of any call option that was subsequently repurchased.

Put Option Sales:

---

[7] This discount is designed to reflect the greater risk that a claimant would face in proving that losses from trading in options was caused by the alleged misrepresentations and not by, for example, the expiring value of the time premium of the option, and the greater volatility and risk assumed by option traders.

(i) For Cabletron put options sold (written) during the period March 3, 1997 through June 2, 1997, inclusive, and

(a) which were not the obligation of the Authorized Claimant as of the close of trading on June 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim";

(b) which were the obligation of the Authorized Claimant as of the close of trading on June 2, 1997, an Authorized Claimant's "Recognized Claim" shall mean 50% of the difference, if a loss, between (x) the sum for which such put options were repurchased at a loss (including commissions, etc.) and (y) the amount received for writing the put options (net of commissions, etc.).

(ii) For Cabletron put options sold (written) during the period June 3, 1997 through December 2, 1997, inclusive, and

(a) not owned as of the close of trading on December 2, 1997, an Authorized Claimant shall have no ($0.00) "Recognized Claim";

(b) owned as of the close of trading on December 2, 1997, an Authorized Claimant's "Recognized Claim" shall mean 50% of the difference, if a loss, between (x) the sum for which such put options were repurchased at a loss (including commissions, etc.) and (y) the amount received for writing the put options (net of commissions, etc.);

(iii) For Cabletron put options sold (written) during the Class Period that were "put" to the Authorized Claimant (*i.e.*, exercised), the Authorized Claimant's "Recognized Claim" shall be calculated as set forth above under "Common Stock Purchases", and as if the sale of the put option were instead a purchase of Cabletron common stock on the date of the sale (writing) of such put option, and the "purchase price paid" shall be the strike price less the proceeds received on the sale of such put option;

(iv) No Loss shall be Recognized based on a sale of any put option that was previously purchased during the Class Period.

80. The Preliminary Approval Order, among other things, granted preliminary approval of the Settlement and ordered that notice of the Settlement be disseminated to the Class. In accordance with the provisions of that Order, Co-Lead Counsel, through the Claims Administrator, the Garden City Group, implemented a comprehensive notice program whereby notice was given to the members of the Class by mail and by publication.[8] Co-Lead Counsel

[8] The Preliminary Approval Order designated the Garden City Group as the Claims Administrator.

have filed contemporaneously herewith the Affidavit of Jose C. Fraga of Garden City Group Re: (A) Mailing of the Notice and Proof of Claim; and (B) Report on Exclusion Requests Received, which provides further details of the Notice that has been provided to date. As Claims Administrator, the Garden City Group is responsible for dissemination of the Settlement Notice, for processing the Proof of Claim forms received, and for distributing the Net Settlement Fund to the Approved Claimants.

81. As set forth in the Fraga Affidavit, approximately 75,102 Notices and Proofs of Claim Forms were mailed to Class Members. The Notice also provided, among other things, the following information necessary to evaluate the benefits of the Settlement to Class Members: (i) an estimate on the recovery per-damaged share of Cabletron stock; (ii) the provisions of the proposed Plan of Allocation; (iii) the amount of attorneys' fees and expenses to be sought; and (iv) a detailed explanation of the reasons for the Settlement. Class Members were required to file objections to the Settlement or request for exclusion from the Class by no later than August 1, 2005. In addition, on June 2, 2005, a Summary Notice was published in the national edition of *The Wall Street Journal*. *See* Affidavit of John J. Mills Re: Publication of the Summary Notice of Pendency of Class Action, Proposed Settlement and Settlement Hearing (filed contemporaneously herewith).

82. The deadline for Class Members to serve objections to the Settlement or to the requested attorneys' fee and expense award expired on August 1, 2005. Perhaps the strongest evidence that both the Settlement and Plan of Allocation are fair and reasonable is that not one

Class Member, each of whom has a direct financial interest in the Settlement, has filed an objection.[9]

**THE REQUIREMENTS OF CLASS CERTIFICATION UNDER F.R.C.P. 23(A) AND 23(B)(3) ARE SATISFIED HERE**

83. The Court's Preliminary Approval Order also preliminarily certified this Action as a class action solely for purposes of the Settlement under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and appointed the Lead Plaintiffs as Class Representatives.

84. Plaintiffs submit that certification of the Class for settlement purposes here is entirely appropriate. The requirements of Rule 23 are readily satisfied as the Class is sufficiently numerous and common questions predominate. In addition, with respect to the proposed Class Representatives, their claims in this litigation are identical to those of other Class Members as all Class Members faced the same alleged injury flowing from Defendants' alleged conduct.

85. Similarly, with respect to adequacy and typicality, the proposed Class Representatives and members of the Class suffered the same alleged damages arising out of the same alleged conduct of the Defendants. As a result, there are no conflicts of interest between the proposed Class Representatives and the other Class Members. Further, the proposed Class Representatives retained counsel with significant securities class action litigation experience. Given the lack of conflict and the retention of competent counsel, the proposed Class Representatives are adequate.

---

[9] Mr. Thomas Scherer, one of the three Class Members who has sought to opt-out of the Class, alternatively objected to the Settlement and award of attorneys fees. *See* Fraga Affidavit. As discussed in the Settlement Brief, Plaintiffs respectfully submit that Mr. Scherer's objection must be rejected as he has asked to exclude himself from the Class, and therefore lacks standing to file an objection.

86. In addition, there is little question that a class action is superior to other available methods under these circumstances. To require individual members of the Class to bring multiple actions against the Defendants would result in an enormous duplication of judicial effort and expense – not to mention that such actions would face the same obstacles with respect to discovery that Plaintiffs faced in this litigation. In sum, there are no issues which would prevent the Court from certifying this Settlement Class and appointing the Lead Plaintiffs as Class Representatives for the Settlement Class.

## EVALUATION OF THE PROPOSED SETTLEMENT

87. The Settlement is the result of more than seven years of hard-fought litigation and extensive arm's length negotiations between experienced counsel, who have concluded that the Settlement is fair, reasonable and adequate and should be approved by the Court. Settlement at this time avoids, among other things, further dispositive motion practice, the significant risks and costs of trial, and subsequent appellate proceedings, which could have delayed final resolution of these claims for years. At the same time, the Settlement provides an immediate benefit to the Class. Accordingly, weighing all relevant factors, it is the informed opinion of Co-Lead Counsel that the Settlement should be approved.

88. The pertinent factors for evaluating the fairness of a proposed class action settlement in the First Circuit are: (1) the potentially significant obstacles to a recovery; (2) the complexity and likely duration of the litigation; (3) the stage of the proceedings at which the settlement was reached; (4) the amount of the settlement in light of the risks of litigation; (5) whether the settlement was reached after arm's length negotiations and the opinion of qualified counsel; and (6) the reaction of the class to the proposed settlement. A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as here, it was

the product of arm's-length negotiations conducted by capable counsel, well-experienced in securities class action litigation.

89. Based on an analysis of the foregoing factors, it is respectfully submitted that the Settlement before the Court is fair, reasonable, and adequate and should be approved.

**A. The Potentially Significant Obstacles to a Recovery**

90. Although Plaintiffs and Co-Lead Counsel believe that they could have proved their claims on the merits, they are aware that there were very difficult issues of law and fact that made a trial of the claims alleged in the SAC a risky and uncertain proposition.

91. As detailed above, Plaintiffs recognized that the central problem in this case -- and one that would remain no matter how many more months or years were spent collecting and dissecting Cabletron's incomplete documentary record -- is that there were significant gaps in surviving Cabletron's documentary records. For example:

- Although Plaintiffs' attorneys and accounting experts spent considerable time reviewing Cabletron's paper records in a warehouse in New Hampshire, certain basic accounting data and records (including customer correspondence files and records of product returns) were incomplete;

- Although Defendants eventually restored and produced a sample set of e-mails to Plaintiffs, this production was also incomplete, *e.g.*, the e-mail boxes for two Individual defendants – former CEO Benson and former President Levine – were purportedly missing (and never produced);

- Although Defendants produced a huge volume of accounting data (amounting to untold millions of separate pieces of information) on a series of computer disks, data from early in the class period was woefully incomplete and the later "SAP" data also lacked explanations of various transactions; and

- A number of third parties who had conducted business with Cabletron during the Class Period (*i.e.*, Cabletron customers, sellers, and distributors) had either destroyed or lost many of the documents relevant to the purported transactions at issue in this litigation.

92. Although Plaintiffs believe that the absence of relevant documentation from Cabletron's files (and from third parties) could have been used to support the SAC's allegations

concerning the alleged fraud and would have been one of the many factors that an expert would consider to be relevant to a final analysis of whether fraud occurred, Defendants would present a completely different picture of the relevant facts and circumstances.

93. Throughout the litigation, Defendants vigorously contested issues of liability and damages. Assuming this case survived summary judgment and proceeded to trial, there could be no assurance that Plaintiffs would be able to persuade a jury that defendants acted knowingly (or at least recklessly) to commit fraud, particularly given the gaps in the relevant records and the absence of witnesses who would directly incriminate the defendants based on first-hand knowledge (as opposed to hearsay or circumstantial evidence).

94. Furthermore, Plaintiffs' allegations would require a jury to understand and consider complex accounting principles and calculations -- an even more daunting task in a case where the Company did not restate its financial statements. For example, Defendants would have argued not only that their revenue recognition decisions were permissible under GAAP, but that the Company had, in any event, established reasonable and appropriate reserves for product returns. Again, although Plaintiffs believe in the merits of their case and believe that they and the Class could prevail on their claims at trial, whether a jury would have found that Defendants violated the federal securities laws is far from certain.

95. Even if Plaintiffs overcame the obstacles presented by, among other things, this action being more than seven years old, and ultimately succeeded on each and every one of the liability issues, Plaintiffs also would face substantial risks in proving causation and damages. Although causation and damages are inextricably linked, each issue involves its own distinct problems.

96. For example, the parties would have likely disagreed on the following damage issues: (a) the appropriate economic model for determining the amounts by which Cabletron securities allegedly were artificially inflated (if at all) during the Class Period; (b) the amounts by which Cabletron securities allegedly were artificially inflated (if at all) during the Class Period; (c) the effect of various market forces influencing the trading prices of Cabletron securities at various times during the Class Period; (d) the extent to which external factors, such as general market and industry conditions, influenced the trading prices of Cabletron securities at various times during the Class Period; and (e) the extent to which the various matters that Plaintiffs allege were materially false or misleading influenced (if at all) the trading prices of Cabletron securities at various times during the Class Period.

97. Although Plaintiffs would present expert testimony to sustain Plaintiffs' burden of proof on damages issues, one cannot predict how a jury will weigh competing experts' testimony. In other words, the crucial element of damages would likely be reduced at trial to a "battle of the experts," and Co-Lead Counsel recognized the possibility that a jury could be swayed by Defendants' experts, who would seek to minimize or eliminate the amount of Plaintiffs' losses by showing that claimed losses were attributable to factors other than the alleged misstatements and omissions.

98. In sum, trial of this case presented substantial risks with respect to establishing liability and damages. When measured against the Settlement obtained, the foregoing risks strongly favored settlement of this action.

**B. The Complexity, Expense and Likely Duration of the Litigation**

99. The delay that would be caused by, and the expenses that would be incurred by, prosecuting this complex litigation through trial also weighs strongly in favor of approving the

Settlement. As discussed above, this litigation plainly raised complex issues of liability, issues relating to, *inter alia*, revenue recognition and establishment of reserves for product returns, which would have involved extensive and technical testimony of declining accounting experts. Similarly, damages issues would have been vigorously contested and involved competing expert testimony.

100. Assuming Plaintiffs defeated Defendants' remaining pre-trial dispositive motions, and that this matter was certified as a class action, trial of this action would take many additional months.[10] Moreover, in light of the highly contested nature of the case, any judgment would almost certainly be the subject of post-trial motions and appeals, further prolonging the case for several years. In short, the "complexity, expense and duration of litigation" factor weighs strongly in favor of approval of the Settlement.

**C. The Stage of The Proceedings and The Amount of Discovery Completed**

101. Having prosecuted this case for more than seven years, Co-Lead Counsel are well aware of the strengths and weaknesses of the parties' claims and defenses. Indeed, as discussed above, Co-Lead Counsel reached the Settlement only after preparing opposition papers to Defendants' multiple motions to dismiss, litigating a First Circuit appeal, conducting extensive discovery and working extensively with Plaintiffs' in-house and external accounting experts. In particular, even with the gaps in discovery discussed above, Plaintiffs engaged in wide-ranging document and of hundreds of thousands of data entries contained in Cabletron's electronic

[10] Although the Court's Preliminary Approval Order certified this Action as a class action, it did so solely for purposes of the Partial Settlement. Therefore, due to the stage of the proceedings, Plaintiffs had not yet moved to certify the Class. Accordingly, Plaintiffs faced the risk of Defendants opposing a motion for class certification, or, at least attempting to narrow the Class.

discovery, including the review and analysis of millions of pages of documents and electronic accounting databases. Through these efforts, Plaintiffs gained a thorough understanding of the legal and factual issues involved in the litigation. Plaintiffs strongly believe that the Settlement is in the best interests of the Class.

### D. The Range of Reasonableness of The Settlement In Light of The Likely Recovery and All The Attendant Risks of Litigation

102. In light of the various strengths and weaknesses of the claims asserted, the Settlement is well within the range of reasonableness.

103. Plaintiffs believe that the evidence in this action, when pieced together, would be sufficient to show that the Defendants defrauded investors. Defendants, however, would present a completely different picture of the relevant facts and circumstances. As described more fully throughout this Declaration, the outcome of the action was highly uncertain.

104. Significantly, there was also no assurance that the Company would have the resources to pay a substantially larger verdict. For example, as of last winter, the total market capitalization of Enterasys, Cabletron's corporate successor, had fallen to only a few hundred million dollars -- far less than the multi-billion dollar market capitalization that the Company had when this action was first brought, and the Defendants' available insurance coverage was limited.

105. By way of comparison, Plaintiffs' Counsel also note that, according to recently published data by Cornerstone Research, the median settlement for all §10(b) cases (which, like this case, require proof that Defendants acted with scienter) that have settled since the PSLRA was passed in 1995 is $5.8 million. *See* "Post Reform Act Securities Settlements: Updated through December 2004," authored by L. Simmons and E. Ryan (available at

www.cornerstone.com), dated March 2005, at 17. The Settlement obtained here is almost twice this median figure.

106. In these circumstances, the proposed $10.5 million settlement is a significant "bird in the hand" that plainly merits approval.

### E. The Settlement Was Reached After Arm's Length Negotiations

107. When a proposed settlement is the result of arm's length negotiations among experienced counsel and parties, there is an initial presumption that the proposed settlement is fair and reasonable. Collusion is not an issue with respect to the Settlement. As explained herein, the parties fought hard over the course of more than seven years of litigation, which included extensive motion practice and an appeal to the First Circuit. The settlement negotiations themselves were intense, hard-fought and conducted at arm's length between experienced and skilled attorneys. Qualified and experienced counsel for both sides, who are intimately familiar with all facets of this case recommend final approval of the Settlement.

### F. The Reaction Of The Class To The Settlement

108. As set forth above, Co-Lead Counsel and the court-appointed Claims Administrator have taken numerous steps to ensure that potential Class Members have been given notice of the Settlement. That not a single Class Member has objected to the Settlement in a case where more than 75,000 individual notices were mailed -- and that only three have sought to be excluded -- is further confirmation that the Settlement is fair, reasonable and adequate.

## THE REQUEST FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE AND SHOULD BE GRANTED

### A. The Requested Fees are Fair and Reasonable as a Percentage of the Settlement

109. As compensation for their efforts, Plaintiffs' Counsel are applying for an award of attorneys' fees in the amount of 30% of the Settlement Fund (equal to approximately

$3,150,000), and also seek reimbursement of $986,967.63 in expenses reasonably incurred in the prosecution and settlement of this action. Plaintiffs' Counsel have been litigating this case for more than seven years without any compensation whatsoever and have personally laid out hundreds of thousands of dollars in expenses without any guarantee of success.

110. As set forth in the Fee Memorandum, the First Circuit and other circuits have held that the simple and direct percentage method of computing fees, which is supported by the PSLRA,[11] is available to this Court in awarding fees in common fund cases. The percentage requested here is within the range of what courts in this Circuit and District routinely award – and, as discussed below, is significantly less than the collective lodestar for Plaintiffs' Counsel.

111. The Compendium of Plaintiffs' Counsel's Affidavits in Support of an Award of Attorneys' Fees and Reimbursement of Expenses (the "Compendium"), which is being filed contemporaneously with this Declaration, contains individual affidavits for each of the firms that worked on this case, setting forth the names of the lawyers of each firm who worked on the litigation, the normal hourly rates currently chargeable by each lawyer, the lodestar value of the time expended by attorneys and paralegals, and the expenses of each firm and the background and experience of each petitioning firm.

112. Factors to be considered when determining attorneys' fees include: the amount of the recovery; the skill and efficiency of Plaintiffs' Counsel; the complexity of the litigation; the risk of nonpayment; and the amount of time devoted. Each of these factors supports of

---

[11] The PSLRA, 15 U.S.C. § 78u-4(a)(6), provides: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class…." (Emphasis added.)

Plaintiffs' Counsel's 30% fee request in this case. In addition, the absence of objection by Class Members is further evidence of the reasonableness of Plaintiffs' Counsel's fee request.

**(i) Amount of Recovery**

113. After years of litigation, Plaintiffs' Counsel have negotiated a Settlement that provides Class Members with an immediate recovery of $10,500,000, plus accruing interest, which is plainly a beneficial recovery for the Class in a case with substantial risks and uncertainties.

114. For example, as discussed above, given that the Company's financial strength is in question, and that there were significant insurance coverage issues between Defendants and their insurers arising from the insolvency of one the Company's carrier, obtaining any significant recovery here was a challenge. That Counsel were, in the face of all obstacles, still ultimately able to obtain a recovery nearly twice as large as the median post-PSLRA recovery ($5.8 million) in a §10(b) case is a factor that supports the requested fee. Plaintiffs' Counsel also note that they received no assistance from any government investigation or prosecution in litigating this case. Although the DOJ commenced an investigation of Enterasys, and indicted three of its former employees in connection to an improper revenue recognition scheme that looked to be very similar to the one alleged in this action, the DOJ's investigation was commenced a number of years after the Initial Actions were filed, and concerned a later time period than events alleged in this Action. In short, the recovery obtained here is entirely the result of Plaintiffs' Counsel's efforts.

**(ii) Skill and Efficiency of Plaintiffs' Counsel**

115. The expertise and experience of Plaintiffs' Counsel is an important factor to be weighed in setting a fair fee. Plaintiffs' Counsel here are experienced and skilled practitioners in

the securities litigation field, and are responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted.

116. The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented by the highly regarded firm of Ropes & Gray, LLP, which has a national reputation as leading defense counsel in securities class action litigation. That Plaintiffs' Counsel were able to negotiate a $10.5 million settlement in the face of such opposition further confirms the quality of Plaintiffs' Counsel's representation.

117. With respect to efficiency, although this case dragged on for more than seven years, it should be noted that this was due more to prior judicial recusals and the necessity of an appeal, rather than to any diffidence on Plaintiffs' Counsel's part. Moreover, to the extent that it was substantially harder and more time consuming for Plaintiffs' Counsel to reconstruct incomplete records than it might have been had the case proceeded immediately to discovery in 1998, it is respectfully submitted that this is not a factor which should be held against Plaintiffs' Counsel in weighing the "efficiency" factor in this case.

**(iii) Complexity of the Litigation**

118. As discussed above and in the Settlement Memorandum, Plaintiffs faced substantial factual and legal hurdles in establishing Defendants' liability under the federal securities laws, especially in light of the gaps in the documentary record and the memories of witnesses, which compounded the inherent difficulties of proving Defendants' fraudulent intent in a §10(b) case. Moreover, even if Plaintiffs were successful in establishing liability, substantial issues would remain in proving damages. Accordingly, this is decidedly not a case in which the lawyers are seeking a large fee for prosecuting a "simple" or "easy" case.

**(iv) The Risk of Non-Payment**

119. Plaintiffs' Counsel agreed to prosecute this case on an entirely contingent fee basis, and therefore knew from the outset that they might expend many millions of dollars worth of attorneys' time and out-of-pocket expenditures in pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action ultimately proved unsuccessful. Contingent fee litigation also carries the risk that, even if successful, the recovery -- as here – will not be large enough to cover base lodestar value of the time they actually expended on this litigation. Professionals in the firms representing the Class collectively expended over 22,300 hours with no assurance of any payment.

120. Practical experience shows that litigation risk is not merely a theoretical construct, but is an all too real aspect of real-life securities litigation, especially since the passage of the PSLRA.

121. There are numerous contingent-fee cases where Plaintiffs' Counsel, after expending thousands of hours and hundreds of thousands of dollars in expenses, have received no compensation whatsoever. There are many other cases where counsel received fees that did not compensate them fully for the time expended. It is unfortunate but true that often the plaintiffs' counsel who take on the most difficult cases, and who are among the most diligent members of the plaintiffs' bar, are the most at risk. The fact that Defendants and their counsel know that the leading members of the plaintiffs' bar are ready, willing and able to try cases gives rise to meaningful settlements such as this. The losses suffered by Plaintiffs' Counsel in other actions where insubstantial settlement offers are rejected, and Plaintiffs' Counsel ultimately receive little or no fee, should not be ignored.

122. Plaintiffs' Counsel know from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation, such as this, is never

assured. The riskiness of contingent litigation is made very real by the many securities cases lost at or after trial.

123. For instance, one of the co-lead counsel here, Milberg Weiss, lost a large securities fraud class action in *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997), when the Court of Appeals reversed a jury verdict of $81 million against an accounting firm after a 19-day trial in Jacksonville, Florida and entered judgment for the defendant. A selection of other cases lost on or after trial are set forth in the note below.[12]

124. Many other cases are lost on summary judgment after thousands of hours have been invested in successfully opposing the motions to dismiss and pursuing discovery.[13]

---

[12] *See, e.g., In re Health Management, Inc. Sec. Litig.*, No. 96-CV-889 (ADS) (E.D.N.Y. 1999) (jury verdict for auditor in securities case); *In re Biogen Sec. Litig.*, No. 94-12177-PBS (D. Mass 1999) (jury verdict for defendants); *Anixter v. Home-State Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning securities fraud verdict for plaintiffs in case filed in 1973 and tried in 1988); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom. Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict for defendants after plaintiff had presented its case to the jury); *In re Apple Computer Sec. Litig.*, No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (court granted judgment n.o.v. vacating $100 million jury verdict in favor of plaintiff class against two individual defendants); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after 11 years of litigation, a jury verdict for plaintiffs, and a First Circuit decision sustaining the plaintiffs' cause of action, the plaintiffs' case was dismissed in an *en banc* decision and the plaintiffs recovered nothing). *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) (summary judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel merger); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (verdict for defendants after trial); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict in securities fraud case).

[13] *See, e.g., Freedman v. Value Health, Inc.*, 34 Fed. Appx. 408 (2d Cir. 2002) (affirming district court's decision granting defendants' motion for summary judgment in securities fraud action); *In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658 (3d Cir. 2001) (affirming summary judgment for accountants for failure to establish *scienter)*; *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (affirming summary judgment for defendants); *Searls v. Glasser*, No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd*, 64 F.3d 1061 (7th Cir. 1995) (same); *In re Clorox Co. Secs. Litig.*, 238 F. Supp. 2d 1139 (N.D. Cal. 2002)(granting summary judgment for defendants); *In re Convergent Techs. Sec. Litig.*, 721 F. Supp. 1133 (N.D.

125. Clearly, there is no truth to the argument that a large fee is guaranteed by virtue of the commencement of a class action. It takes hard, diligent work by skilled counsel to develop facts and theories which will either persuade defendants to enter into serious settlement negotiations, or which will succeed at trial.

126. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

127. Lawsuits such as this and those described above are exceedingly expensive to successfully litigate. Outsiders often focus on the gross fee awarded, but ignore the fact that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state and local authorities, and when reduced to a bottom line are far less remunerative to each individual firm involved than the gross fee awarded appears.

128. In understanding the general risks of contingent litigation, it is also necessary to analyze the economics of running a law office. It is generally accepted that a law office's overhead is well in excess of 50% of its gross billing fees. This amount is necessary to cover such expenses as rent, associate, clerical and staff salaries, insurance and telephones, among other things, which expenses must be paid whether or not a fee ultimately is awarded.

129. Another factor is the contingent fee attorney's loss of the use of fees earned, but unpaid, during the course of litigation. Contingent fee attorneys also incur an opportunity cost due to diversion of resources from other potentially profitable matters. In contrast, lawyers

---

Cal. 1988)(summary judgment against plaintiffs after five years of litigation), *aff'd,* 945 F.2d 507 (9th Cir. 1991).

representing paying clients receive their fees regularly and immediately. Those fees are then available to them for investment, which in turn creates additional revenues for them over time. A contingent fee lawyer loses the use of that money, often for years.

130. In sum, as a basic principle of economics and common sense, everything else being equal, no rational accomplished attorney would take the necessary risk of contingent fee litigation without the potential for greater compensation if the case succeeds. And as noted herein, notwithstanding the significant risk of non-payment in this case, the requested fee here would actually result in a "negative multiplier" of .39 -- or less than half Counsel's lodestar.

**(v) The Amount of Time Devoted**

131. The significant time and effort expended by Plaintiffs' Counsel over the seven years of this litigation plainly supports the requested fee award in this case. Plaintiffs' Counsel have a total combined lodestar of more than $8 million, which represents over 22,300 hours expended in litigating this case. This enormous effort, which yielded the Settlement before the Court, was reasonable and necessary in light of the complexity of this case and the vigorous defense mounted by Defendants.

132. Once Plaintiffs were permitted to commence discovery, Plaintiffs' Counsel reviewed millions of pages of documents and voluminous data contained in accounting databases produced by Defendants, as well as documents produced by KPMG and certain of Cabletron's former customers, resellers, and distributors. In prosecuting this action, Co-Lead Counsel also worked closely with their forensic accounting and computer experts with respect to the complex accounting issues (including those associated with gaps in the electronically produced accounting databases) that Plaintiffs faced in this action. In sum, the enormous time and effort expended by Plaintiffs' Counsel, without any guarantee of payment, strongly supports the requested 30% fee in this case.

133. Finally, as discussed above, more than 75,000 copies of the Notice were mailed to potential Class members, and a Summary Notice was published in The Wall Street Journal. The Notice and Summary Notice advised Class members that Plaintiffs' Counsel would seek a fee "in an amount not greater than one-third (33⅓%) of the Gross Settlement Fund" and reimbursement of their expenses "in the approximate amount of $1,000,000" plus a proportionate share of the interest earned by the Settlement Fund.

134. As of the date of this filing, not a single objection to the fee or expense request has been received, and only three Class Members have sought to opt-out of the Class. The reaction of the Class therefore also supports the requested fee award.

**B. The Fee Request is Also Fully Justified Under Lodestar/Multiplier Approach**

135. The fact that Plaintiffs' Counsel are requesting a fee that is significantly less than their collective lodestar from this seven year litigation is further evidence that the fee request here is reasonable. (It should be noted that the lodestar figures do not include the time which plaintiffs' attorneys have expended in preparing the Fee Application.).

136. As set forth in the individual affidavits of Plaintiffs' Counsel filed herewith, Plaintiffs' Counsel expended more than 22,300 hours in the prosecution of this action, which were reasonable and reflect Plaintiffs' Counsels' commitment to aggressively prosecute this Action while, at the same time, avoiding duplication or repetition of tasks. Applying Plaintiffs' Counsels' normal hourly rates to the hours expended in this Action yields a lodestar amount of approximately $8,034,328. As explained in the individual affidavits from each of Plaintiffs' Counsel, these hours were compiled from contemporaneous time records maintained by each attorney and each paralegal affiliated with the firms that participated in this case.

137. In short, even if the requested 30% fee were awarded in full (which would result in a fee award of approximately $3,150,000), the award would not come close to equaling the lodestar value of the time actually devoted by Plaintiffs' Counsel -- let alone result in a positive "lodestar multiplier" that would compensate counsel for the contingent risk inherent in cases of this type.

## C. The Expenses Incurred By Plaintiffs' Counsel Were Reasonable

138. Plaintiffs' Counsel also request reimbursement of $986,967.63 in expenses, which is less than the estimate of expenses contained in the Notice. The amount of out-of-pocket expenses, by category, incurred in this action is also set out in the individual affidavits that are part of the Compendium of Affidavits referenced above. Each affidavit also notes that the expenses for which reimbursement is requested are reflected on the records of each firm prepared in the normal course of business and are an accurate record of the expenses incurred.

139. Such expenses were essential to the successful prosecution and resolution of this action. A breakdown of the aggregate expenses incurred by category is contained in the Compendium. Much of this amount was expended for photocopying, court reporting services, and professional fees paid to Plaintiffs' experts and consultants. Plaintiffs' Counsel seek interest on their incurred, unreimbursed expenses at the same rate as earned by the Gross Settlement Fund from the date the Fund were established through the date of payment. The Notice mailed to Class Members states that Plaintiffs' Counsel intended to apply for reimbursement of their actual, out-of-pocket expenses up to a maximum amount of $1,000,000, plus interest at the same rate as earned by the Settlement Funds. No objection has been raised to date by any Class Member as to Plaintiffs' Counsel's request for reimbursement of expenses and interest thereon.

140. In light of the complex nature of this action, as well as the procedural history of this seven year litigation, the expenses incurred by Plaintiffs' Counsel were necessary and

appropriate and were reasonably related to the pursuit of the interests of the Class. Accordingly, Plaintiffs' Counsel should be reimbursed for their expenses incurred in connection with this action.

## CONCLUSION

141. In view of the benefit conferred on the Class, the risks of this litigation, the enormous effort of Plaintiffs' Counsel throughout the seven years of prosecuting this action, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing of Plaintiffs' Counsel at the Bar, it is respectfully submitted that the Settlement of $10,500,000, plus interest, should be approved as fair, reasonable and adequate; that the Plan of Allocation be approved; and that a fee in the amount of 30% of the Gross Settlement Fund should be awarded to Plaintiffs' Counsel, together with reimbursement of expenses in the amount of $986,967.63 for Plaintiffs' Counsel, with interest at the same set rate as earned by the Gross Settlement Fund from their inception through the date of payment, with the award of attorneys' fees to be allocated among Plaintiffs' Counsel in a fashion which, in the opinion of Co-Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of the action.

We declare under penalty of perjury that to the best of our knowledge the foregoing is true and correct.

William C. Fredericks

Herbert M. Milstein