UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| IN RE CABLETRON SYSTEMS, INC. SECURITIES LITIGATION | : | |
| CHARLES MESKO, et al. | : | |
| v. | : | C.A. No. 99-408S |
| CABLETRON SYSTEMS, INC., et al. | : | |

# SPECIAL MASTER'S REPORT

By order of the District Court dated January 17, 2006, I was appointed as a Special Master pursuant to Fed. R. Civ. P. 53 and directed to investigate discrepancies between statements made by confidential sources to Plaintiffs' investigators and statements made by those same sources in affidavits subsequently obtained by Defendants' counsel. (Document No. 119). Based on the results of my investigation, I issue the following report pursuant to Fed. R. Civ. P. 53(f):

## I. Background

### A. Chronology

This securities fraud litigation began nearly a decade ago in the District of New Hampshire. The following is a chronology of important events in this case:

1. October 24, 1997 – First Class Action Complaint filed in the District of New Hampshire (USDC-NH 97-542JD).

2. March 3, 1998 – Several New Hampshire cases consolidated.

3. April 24, 1998 – First Consolidated Amended Complaint filed in New Hampshire.

4. December 23, 1998 – First Consolidated Amended Complaint dismissed with leave to amend by the late District Judge Devine.

5. January 22, 1999 – Second Consolidated Amended Complaint ("SCAC") filed which added references to sources.

6. April 14, 1999 – Motion to Dismiss filed by Defendants.

7. August 19, 1999 – Case transferred to the District of Rhode Island.

8. May 23, 2001 – Motion to Dismiss SCAC granted by District Judge Lisi.

9. November 12, 2002 – First Circuit Court of Appeals reverses (with one narrow exception) and remands. See In re Cabletron Systems, Inc., 311 F.3d 11 (1st Cir. 2002).

10. December 2, 2002 – Case assigned to District Judge Smith.

11. January 17, 2003 – Defendants answer SCAC.

12. March 2003 – Plaintiffs disclose identity of source Timothy Smith.

13. May 6, 2003 – Timothy Smith deposed.

14. July 16, 2003 – Defendants file a Motion to Strike Anonymous Source Allegations and to Dismiss SCAC.

15. July 1, 2004 – Judge Smith orders Plaintiffs to disclose the identity of sources "whom plaintiffs cite as support for their allegations in the [SCAC] and whom they intend to call as witnesses at trial" to Defendants by July 15, 2004, and gives Defendants until October 15, 2004 to depose such disclosed sources.

16. November 5, 2004 – Defendants file a Second Motion to Strike Anonymous Source Allegations and to Dismiss SCAC.

17. January 2005 – Case reported settled.

18. August 30, 2005 – Settlement Fairness Hearing held before Judge Smith at which he orders Plaintiffs to file an in camera submission regarding the source interviews.

19. January 13, 2006 – Hearing on Appointment of Special Master held by Judge Smith.

20. January 18, 2006 – Appointment of Special Master.

**B. Media Attention**

Cabletron Systems, Inc. was based in Rochester, New Hampshire. At its peak in or about 1997, Cabletron was reported to be one of New Hampshire's largest private employers. It was founded in the 1980s by Defendants Robert Levine and Craig Benson. During the Class Period, Mr. Levine was Cabletron's President/CEO and a Director, and Mr. Benson was its COO and Board Chairman. Mr. Benson was elected Governor of New Hampshire in November 2002 and served one term from January 2003 through January 2005. Mr. Benson was defeated in his reelection bid in November 2004.

Because of Cabletron's visible presence in New Hampshire and Mr. Benson's political career, this litigation was the subject of a good deal of media attention. While the content contained in the newspaper reports may or may not have been completely accurate, the articles were in the public domain. Thus, the media scrutiny likely caught the attention of, and possibly influenced some of the sources, as most of them lived in New Hampshire and had been affiliated with Cabletron at some point. The following are some examples of such reporting.

1. **<u>The Union Leader</u> (Manchester, New Hampshire) – November 29, 1997, "Cabletron Heads Sued by Angry Stockholders: Deception Charged After Stock Plummets."**

This article reported the initial filing of this class action litigation and noted that "key insiders of the company" including Mr. Levine sold over "$42.69 million of their Cabletron stock prior to the time that [certain] adverse information was disclosed to the investing community."

**2. <u>The Union Leader</u> – December 23, 1997, "Sales Off, Cabletron Profits Plummet."**

This article reported Cabletron's poor earnings and sales results as well as recent job cuts in New Hampshire. Further, it reported that Cabletron's stock had dropped "from $46 to $30 a share in June and then into the $15 a share range on December 3."

**3. <u>The Union Leader</u> – November 15, 2002, "Gov.-elect Benson may be called to testify in lawsuit."**

This article reported on the First Circuit's November 12, 2002 decision reviving this litigation, which was issued one week after Mr. Benson's election as Governor. Plaintiffs' counsel, Mr. Dumaine, was quoted as commenting that the Governor would likely be deposed and testify in the suit. Defendants' counsel, Mr. Wolkoff, countered by suggesting that the case may not get to that point because "there is a significant chance these anonymous former employees may never appear and if they do, they won't say what the complaint says they'd say." He also commented that Defendants "are going to ask the district court to subpoena these anonymous people to see if they exist and to see if they allege what the complaint asserts they allege, and to see if they know or are in a position to know what the complaint says they know." A similar article was reported in the <u>New Hampshire Business Review</u> on November 29, 2002, "Suit puts focus on Enterasys and Benson."

**4. <u>The Union Leader</u> – February 26, 2003, "Benson's former firms fight fraud allegations."**

This article also discusses Defendants' strategy regarding the confidential source allegations. It reports that "the company is asking the court to order the plaintiffs to identify these sources and allow its lawyers to depose them before any other depositions are taken" and notes the case may be dismissed if the sources "cannot provide testimony to support the allegations attributed to them."

Plaintiffs' counsel countered by contending that this strategy was a delay tactic and "unprecedented and contrary to" the Federal Rules of Civil Procedure.

**5. The Union Leader – August 14, 2003, "Kerry puts more emphasis on war service."**

This political column reported briefly on Governor Benson and this pending suit. It notes again Defendants desire to have the sources identified and reports that one such source, Timothy Smith, was deposed in May and reportedly "admitted...he knew nothing of the schemes alleged in the suit."

**6. The Union Leader – October 26, 2004, "Taxes, integrity dominate race for the top job."**

This article reported on Governor Benson's reelection race with current Governor Lynch. One allegation against Governor Benson which was included in the article was that he retaliated against a state employee who blew the whistle on him regarding an alleged wetlands violation at his "oceanfront" home. This allegation of retaliation was also the subject of reporting earlier in 2004. For instance, an AP Alert of June 17, 2004 "Lawmakers seek investigation of DES employee transfers," reported that the state employee who led the probe into a wetlands issue involving Governor Benson was allegedly transferred in April to an office job in retaliation for her actions, and she sought restoration of her prior job and "contemplated filing a grievance" over the claimed retaliatory transfer. The New Hampshire Department of Environmental Services (DES) countered that the transfer was part of a new "managerial rotation" program and would benefit the employee.

## II. Investigation Summary

### A. Primary Documents Reviewed

1. SCAC dated January 22, 1999.

2. The First Circuit's decision in In re Cabletron Systems, Inc., 311 F.3d 11 (1st Cir. 2002).

3. Defendants' Motion to Strike and Supporting Memorandum / Appendix filed July 16, 2003. (Document No. 51).

4. Defendants' Second Motion to Strike and Supporting Memorandum / Appendix filed November 5, 2004. (Document No. 82).

5. Plaintiffs' in camera submission to Judge Smith dated September 26, 2005 with supporting Affidavits / Exhibits regarding pretrial investigation and source interviews.

6. Twenty-three source affidavits obtained by Defendants in September and October 2004.

7. Excerpts from depositions of five sources taken by Defendants in October 2004, and excerpts from deposition of Timothy Smith taken by Defendants on May 6, 2003.

8. Plaintiffs' in camera submission to the Special Master dated January 30, 2006 in response to my request for the identity of each of the sources referenced in the SCAC.

**B. Interviews Conducted**

1. January 27, 2006 – Defense Attorneys Christopher Carter and Michael Connolly (Hinckley Allen & Snyder – Concord Office) and Harvey Wolkoff (Ropes & Gray – Boston Office). Following the interview, Defendants made an in camera submission at the request of the Special Master dated February 6, 2006 which includes information regarding the source interviews such as a list of questions used, samples of interview notes, correspondence regarding draft affidavits and revisions to affidavits requested by the sources.

2. February 1, 2006 – Plaintiffs' Attorney William Fredericks (Milberg Weiss – New York Office) and Milberg Weiss Investigators Mr. W. Steven Bursey and Mr. Jason Brash. Following the interview, Plaintiffs made in camera submissions at the request of the Special Master dated February 6, 7 and 10, 2006. The February 6, 2006 submission included copies of form letters to the sources, interview outlines used by Plaintiffs' investigators and handwritten interview notes. The February 7 and 10, 2006 submissions consisted of tape recordings of interviews of the sources conducted by Plaintiffs' investigators. The tapes also contained interviews of individuals who were not identified as sources and generally were either unable or unwilling to provide useful information regarding this litigation.

3. March/April 2006 – Several confidential sources have been interviewed by phone.

## III. Findings[1]

Pursuant to Judge Smith's July 1, 2004 Discovery Order, Plaintiffs provided Defendants on July 15, 2004 with a list of confidential sources that Plaintiffs "may want to call as witnesses at trial, including witnesses who provided information used in the Complaint." The list consisted of twenty-nine individuals and included only their last known addresses, but did not include phone numbers or other contact information. Judge Smith gave Defendants ninety days to depose Plaintiffs' sources.

Defendants faced a formidable task in contacting and deposing these twenty-nine sources in a relatively short time frame. The task was also complicated by the fact that Defendants had no idea when these sources were interviewed by Plaintiffs, which ones would likely be called at trial, which

[1] In connection with my review and an earlier request from Judge Smith, both sides have made in camera submissions to the Court of trial preparation materials protected from disclosure as attorney-work product. Given the current posture of this case and the fact that the pending class settlement has not yet been finally approved, there is a remote possibility that this case may ultimately have to be tried. Thus, in order to protect confidentiality, I have intentionally drafted my findings to be somewhat general and to not specifically reveal the substance of such materials.

ones were the sources referenced in the SCAC, or which fraud allegation(s) the source was purportedly supporting. A close review of the timing of Plaintiffs' contacts with the sources is revealing as to their likely strategy. From my interviews and the materials reviewed, it appears that only twelve of the twenty-nine sources were contacted in the early stages (1998-1999) of this case. Although eleven of those twelve were contacted prior to January 22, 1999 (the date the SCAC was filed), it is noteworthy that four of those sources were contacted only a day or two before the SCAC (a seventy-nine page pleading) was filed by Plaintiffs.

This shows that only seven of the twenty-nine sources could have provided factual support for the commencement of these later consolidated cases. Of those seven, two never worked for Cabletron and did not provide any first-hand information regarding any of the allegations in the SCAC. One was apparently involved in a personal dispute with Defendant Levine at the time. The other was a manager of a restaurant that employed a former Cabletron employee as a waitress. Thus, as to source information, it appears that this litigation was initiated based on information obtained from five confidential sources who worked at Cabletron during the Class Period.

As part of my review, I asked Plaintiffs to identify the supporting source(s) for each allegation in the SCAC which references a confidential source. Plaintiffs identified six such sources from the disclosed list of twenty-nine. Plaintiffs identified an additional source for a single allegation in the SCAC. That source was never disclosed to Defendants, according to Plaintiffs, due to inadvertence.[2] Since two out of these seven sources were interviewed on the eve of the filing of

---

[2] The source, a former Cabletron employee, was interviewed in July 1997 by an outside investigator retained by Plaintiffs in the beginning stages of this case. Most of the investigation was later conducted by "in-house" investigators, so, it is understandable how this single source may have been missed.

the SCAC, it is clear that at the time this litigation was initiated, there were only a handful of sources.

If that was the case, it is curious that a total of twenty-nine sources were ultimately disclosed by Plaintiffs. From my interviews and document review, I believe there were three primary reasons, and all were likely strategic. Plaintiffs anticipated, correctly so in hindsight, that Judge Smith would ultimately order disclosure of the identity of the confidential sources. Thus, Plaintiffs undertook an effort in late 2003 and early 2004 to bolster the number of their sources. Of the twenty-nine disclosed sources, fifteen were interviewed in 2003 (all but one in November or December) and two in January 2004. The first and obvious reason was to try to beef up the strength of Plaintiffs' case and its settlement value. As Cabletron's workforce shrank, the group of former Cabletron employees and thus the group of potential confidential sources for Plaintiffs grew. The second reason was to increase the number of sources to give their original sources some "cover" as being part of a larger group. The third reason was to spread Defendants' resources over a larger group and avoid putting the focus of those resources on a handful of sources.

The task given to me by Judge Smith is narrow. It is to investigate discrepancies between the information provided by the sources to Plaintiffs' investigators and the Affidavits subsequently obtained by Defendants from those same sources. As part of my review, I met with Plaintiffs' primary investigators, who interviewed the sources, and Defendants' lawyers, who later contacted those sources and obtained Affidavits from most of them. I found no indication that either side used illegal or unethical tactics in dealing with the sources. Nearly all of the interviews conducted by Plaintiffs' investigators were done over the phone and resulted in contemporaneous typed summaries. Plaintiffs' investigators did not have a general practice of tape recording interviews.

However, during my meetings with them, they disclosed that some may have been recorded. I subsequently requested copies of any such recordings, and Plaintiffs provided me with one taped interview conducted by Mr. Bursey, and a total of seven tapes each containing recordings of several interviews conducted by Mr. Brash. Mr. Bursey, Plaintiffs' Chief Investigator, is a retired FBI agent. He was hired by Plaintiffs' counsel in November 1997, and Cabletron was apparently his first foray into the world of private securities fraud class actions. Mr. Brash is a former nurse hired in 2003 who coincidentally also cut his teeth on this case. After spending a substantial amount of time listening to these tape recordings, I have no basis to conclude that Plaintiffs' investigators acted in other than a professional and ethical manner.

Similarly, with respect to Defendants' contact with the sources, I have no basis to conclude that Defendants' counsel acted in other than a professional and ethical manner. Defendants served the sources with deposition subpoenas but offered them the opportunity to provide a sworn statement in lieu of a deposition. The attempt to utilize affidavits as opposed to depositions is understandable given that it would have been a herculean task to locate, serve and depose all of the sources in ninety days. It also appears that the option of giving an affidavit was voluntary. The sources must have felt free to refuse to give affidavits, as six of them opted for depositions. As to the content of the Affidavits, they were drafted by Defendants' counsel after interviewing the sources and, in my opinion, were drafted in a narrow manner to assist Defendants' position as much as ethically possible. However, it also appears that the sources felt free to request changes as Defendants provided several examples of revisions which were requested by the sources and made by Defendants' counsel prior to the final version of the Affidavit being signed. Two of the sources I interviewed confirmed to me that they were given the opportunity to review their draft Affidavits,

and changes were made at their request. In addition, a couple of the signed Affidavits contain handwritten revisions which were initialed by the affiants at the time of signing.

Although there may appear at first blush to be a dichotomy between the source interviews and later affidavits, my close review reveals that most of them are fairly consistent. There were a total of twenty-three Affidavits taken by Defendants from the sources, and sixteen of them are fairly consistent. For instance, some sources told Plaintiffs' investigators that they heard rumors of practices such as channel stuffing. These same sources indicated a lack of any "first-hand knowledge" of such practices in their subsequent Affidavits taken by Defendants without making any reference to the previously reported rumors. In addition, in a couple of cases, Plaintiffs' investigators interviewed sources who did not work for Cabletron until after the Class Period but provided potentially relevant post-Class Period information. Defendants obtained Affidavits from these sources which confirmed that the source was not employed during the Class Period and had no knowledge of Cabletron's practices or operations prior to their date of hire. The Affidavits simply do not address any post-Class Period information.

After interviewing several of the sources, a common theme became apparent. The sources had typically left Cabletron's employment on unfavorable terms. The sources also confirmed that they did not seek out Plaintiffs' attorneys, but instead were contacted and interviewed over the phone by Plaintiffs' investigator, and were not told how they were identified as a potential source. Although none of them indicated that Plaintiffs' investigator engaged in inappropriate conduct, they generally described his demeanor as "aggressive" in trying to elicit information from them. On the other hand, Defendants' representatives were described as more "business-like" and "process-oriented." As to the allegations relevant to this case, the sources, as they did in their Affidavits,

uniformly denied to me any first-hand knowledge and indicated that they reported rumors and things they had heard to Plaintiffs' investigator. One source told me that rumors were "rampant" at Cabletron during that time.

Plaintiffs' investigators prepared contemporaneous typed memoranda summarizing the source interviews which were submitted to Judge Smith for in camera review. However, the memoranda are somewhat conclusory as to the basis for the source's claimed personal knowledge. While the memoranda at times note when the source had only "heard" about certain practices, they often lack detail as to date and other specifics as to statements which Plaintiffs appear to claim are based on first-hand knowledge.[3]

As previously noted, I requested that Plaintiffs identify the sources claimed to support the source allegations in the SCAC. A review of a couple of such allegations (paragraphs 48(c)(iii) and 48(e)) is illustrative. Paragraph 48(c)(iii) alleges, in relevant part, that "according to two former Cabletron employees (at least one of whom was personally familiar with the pertinent facts), the Company's SmartSwitch production efforts were plagued by major delays resulting from defects and problems involving the wiring of the switches." Plaintiffs identified two sources as support for this allegation. However, there is no indication in the interview memoranda for either of these sources that they had any knowledge of any "defects and problems" with the SmartSwitch "wiring." In fact, as documented in Plaintiffs' interview memoranda, neither source refers specifically to wiring, and only one of them mentions a "design problem," but the same memorandum notes that that particular source indicated he "was not well acquainted with the SmartSwitch."

---

[3] In her May 23, 2001 Memorandum and Order dismissing the SCAC, Judge Lisi also noted that Plaintiffs failed to "provide any indication of the timing of the former employees' alleged knowledge" regarding the SCAC allegations. M&O at p. 2 n.1.

Paragraph 48(e) deals with claimed problems in Cabletron's European operations and alleges, in relevant part, that "[a]ccording to a former Cabletron employee who was privy to information and discussions about the relevant facts, the Company's undisclosed financial difficulties during the Class Period were further exacerbated by the fact that Cabletron's European sales force was in disarray, severely hindering the Company's ability to achieve sales in that valuable market." In 2000, Plaintiffs advised Judge Lisi that the allegations in paragraph 48(e) were made on "information and belief." (Document No. 23). In response to my 2006 request, Plaintiffs changed course and identified one source as support for this allegation. However, upon closer review, it does not appear that this source was employed in a position which would logically make him "privy" to such information and, in his interview memorandum, there is only one sentence where the source indicates a high turnover rate in "overseas managers." On the other hand, there is nothing specific regarding the sales force in general, Cabletron's ability to compete in the European market or the "discussions" referenced in paragraph 48(e).

**IV. Conclusion**

As noted above, my investigation has not revealed any improper conduct by either side in dealing with the sources. With respect to Defendants, it appears that their dealings with the sources were professional and at "arms-length." The sources I interviewed uniformly confirmed this fact.

With respect to Plaintiffs, it appears that they were aggressive in seeking to solicit information from the sources but not inappropriately so. Again, the sources I interviewed uniformly confirmed this fact. In many respects, the sources I interviewed confirmed the information provided to Plaintiffs' investigator as noted in the interview memoranda but typically denied personal knowledge. As to some information, they did not recall providing the information, but this could

reasonably be attributed to the passage of nearly seven years since the initial interviews. It does not appear reasonable that Mr. Bursey, a retired FBI agent, would slip fabricated statements into an otherwise accurate interview memorandum. If the memoranda can be criticized at all, it is because they are somewhat lacking in detail as to the source of claimed personal knowledge and dates. Although it is possible that this lack of detail was intentional, it is equally plausible that the sources simply did not provide the detail during their telephone interviews.

It is also important to keep in mind the timing of these documented statements. The interview memoranda were prepared with some assurance of confidentiality and at a time when the source had recently become a former Cabletron employee and likely an unhappy one. The Affidavits were obtained years later at a time when a named Defendant was the Governor and the case had been the subject of media attention including discussion of the source allegations. It is reasonable to conclude that the sources may have been more precise in providing information to Defendants in connection with a sworn affidavit than they were when they spoke over the phone to Plaintiffs' investigator years earlier.

While it is not possible for me, without the benefit of a full adversarial hearing, to offer any definitive opinion as to the merits of Plaintiffs' claims in this case, it appears that this case was initiated based on information obtained from only a handful of sources, and such information does not strike me as particularly compelling as to the issue of fraud. Further, since my investigation has focused only on the sources who provided later Affidavits, I have not examined any other evidence Plaintiffs may have in support of their fraud allegations. The bottom line is that, although my investigation has revealed some discrepancies between the interview memoranda and the source affidavits, the discrepancies are not nearly as extensive as they might appear at first blush. Further,

my investigation has not revealed any improper conduct by either side which resulted in these discrepancies.

LINCOLN D. ALMOND
United States Magistrate Judge
April 26, 2006