UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
                              )
IN RE CABLETRON SYSTEMS, INC. )
SECURITIES LITIGATION         )
                              )
Charles Mesko, et al.,        )
            Plaintiffs,       )
                              )
     v.                       )    C.A. No. 99-408S
                              )
Cabletron Systems, Inc., et al. )
            Defendants.       )
                              )
```

MEMORANDUM AND ORDER GRANTING CLASS CERTIFICATION, FINAL
APPROVAL OF SETTLEMENT, AND PLAN ALLOCATION

William E. Smith, United States District Judge[1]

I.   Introduction

Before the Court is a Motion for Class Certification, Motion for Final Approval of Class Action Settlement, and Plan of Allocation, as well as Plaintiffs' Motion for Award of Attorneys' Fees and Reimbursement of Expenses. This Court previously granted preliminary approval of the Settlement and the Plan of Allocation on April 8, 2005. At the final settlement hearing on August 30, 2005, the Court closely questioned Plaintiffs' counsel with respect to various aspects of the attorneys' fee and expense reimbursement application. The Court raised a specific concern regarding apparent discrepancies between sworn affidavits filed by a number of anonymous sources and claims made by Plaintiffs' counsel throughout the duration of the case, regarding the evidence of

---

[1] Of the District of Rhode Island sitting by designation.

misconduct those same sources would provide at trial. As a result, the Court, after notice and a hearing on January 18, 2006, appointed Magistrate Judge Lincoln D. Almond to serve as a Special Master to investigate these apparent discrepancies. Judge Almond's investigation was completed in three months and his report was filed on April 26, 2006. Judge Almond determined that there was no basis to conclude that anyone had engaged in any improper conduct. Although he found that Plaintiffs' counsel had been "aggressive in seeking to solicit information from the sources," they were not "inappropriately" aggressive.

After receiving the Special Master's report, counsel declined an additional hearing and requested that the Court enter an order of final approval of the Settlement and Plan of Allocation as well as approve Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Expenses.

For the reasons set forth at the preliminary and final hearing, and discussed herein, the Court grants the Motion for Class Certification and approves the Settlement and Plan of Allocation; furthermore, the Court approves the motion for attorneys' fees and reimbursement of expenses in the amounts set forth in this Order. The Court believes a thorough discussion of the fee application and the methodology to be employed in considering this motion is warranted. The discussion that follows provides a reasoned analysis for the award in this case, and will

be useful in assisting the Court and counsel in other pending cases, and future cases.

## II. Background

This is a securities class action lawsuit brought pursuant to the Private Securities Litigation Reform Act ("PSLRA"). The case, approaching its tenth year in the judicial system, has traveled from New Hampshire to Rhode Island, through various district judges' chambers, to the Court of Appeals and back, finally landing with this writer in late 2002.[2] While familiarity with the matter is assumed, a brief review of the history of the case is necessary to set the stage. Those interested in a more detailed recitation of the factual background may refer to In re Cabletron Sys., Inc., 311 F.3d 11 (1st Cir. 2002).

## III. Facts and Procedural History

In the mid-1990s, Cabletron Systems, Inc. ("Cabletron") was known as one of the nation's leaders in the manufacture and sale of large computer networks. Id. at 23. It was also a company riding ` a wave of financial success: thirty-two straight quarters of record growth, which culminated in a 26 percent increase in net sales for the quarter ending in February 28, 1997. Id. But like many waves of financial prosperity, Cabletron's good times proved ephemeral. In the following three quarters, Cabletron's stock

---

[2] This case was assigned to a Rhode Island district judge to sit by designation in the District of New Hampshire because all New Hampshire district judges had recused themselves.

3

price plummeted, including a 67 percent drop in price during the period March 3, 1997 through December 2, 1997. Id.

On October 24, 1997, Cabletron investors ("Plaintiffs") filed a class action lawsuit in the United States District Court for the District of New Hampshire against Cabletron and seven of its executives and directors ("Defendants"), alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 (2002). Id. at 20. Specifically, Plaintiffs alleged that during the class period (March 3, 1997 to December 2, 1997), Cabletron's executives and directors knew of, but failed to disclose to the public, serious problems facing Cabletron that were likely to cause significant drops in revenue. Id. at 23-24. Plaintiffs further accused Defendants of using a variety of techniques to fraudulently inflate Cabletron's quarterly net revenue and using the falsely inflated figures in SEC filings and company press releases. Id. at 24. The Complaint also claimed that corporate insiders sold their own stock in significant amounts during and after the class period in order to secure profits before the stock price bottomed out. Id. at 24, 27. Importantly, many of the Complaint's allegations were substantiated in large part by statements given to Plaintiffs' counsel by anonymous former Cabletron employees and others who

4

claimed to have personal knowledge of the fraudulent practices employed by Defendants. _Id._ at 28.

Defendants responded to the lawsuit by filing a Motion to Dismiss. _Id._ at 22. The case then embarked upon its whistlestop tour through the chambers of all the New Hampshire district judges, Chief Judge Ernest C. Torres, and finally landing on the docket of Judge Mary M. Lisi of this district. Thereafter, Judge Lisi granted Defendants' Motion to Dismiss, holding that Plaintiffs' Second Amended Complaint did not meet the PSLRA pleading requirements. _Id._ Plaintiffs appealed.

IV. _Court of Appeals Decision_

In a thorough decision that has largely set the standard for pleading under the PSLRA in this Circuit, the First Circuit Court of Appeals overturned the dismissal, ruling that Plaintiffs had in fact satisfied the PSLRA pleading requirements. _Id._ at 20. The Court of Appeals first examined whether the Complaint specified each allegedly misleading statement or omission, the reasons why the statements or omissions were misleading, and, "if an allegation regarding the statement [was] made on information and belief," whether "the complaint [] state[d] with particularity all facts on which that belief [was] formed." _Id._ at 27 (quoting 15 U.S.C. § 78u-4(b)(1)). Second, the Court analyzed whether the allegedly misleading statements or omissions were material, and finally, whether each act or omission alleged in the Complaint "state[d]

with particularity facts . . . giv[ing] rise to a 'strong inference' of scienter." Id. at 28 (citing 15 U.S.C. § 78u-4(b)(2)).

The Court assessed whether allegations in the Complaint – that were substantiated by numerous confidential sources – were allegations made on "information and belief," as they must be to meet the higher pleading standard specified in the PSLRA. Id. at 28. In the face of a circuit split over what constitutes "information and belief," the Court adopted the test utilized by the Second Circuit in Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000). Id. In doing so, the Court of Appeals rejected a per se rule against a plaintiffs' use of anonymous sources at the pleading stage. Cabletron, 311 F.3d at 20, 28. Instead, the Court adopted a case-by-case approach which "look[s] at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.'" Id. at 29 (quoting Novak, 216 F.3d at 314).

On the whole, despite the fact that Plaintiffs' Complaint lacked some specific details and other types of evidence previously recognized as important in securities fraud cases, the Court was convinced that the "consistent details provided from at least half a dozen different sources across various alleged schemes, reinforce each other and suggest reliability of the information reported" to satisfy the PSLRA pleading requirements. Id. at 33.

Having found that Plaintiffs pled fraud with the necessary particularity, the Court next held that Plaintiffs had sufficiently identified specific materially misleading statements based upon the alleged fraudulent activity.   These statements consisted of financial reports filed with the SEC, Cabletron officials' direct statements in the media, and statements made by third parties.  <u>Id.</u> at 34-38.

Finally, under the heightened PSLRA pleading requirements, the Court considered whether Plaintiffs' Complaint pled with particularity facts that gave rise to a "strong inference" of scienter.  <u>Id.</u> at 38.  Taking Plaintiffs' allegations as true, the Court concluded that allegations of insider trading and the many alleged methods used to fraudulently boost quarterly revenues sufficiently demonstrated scienter.  <u>Id.</u> at 40.  Thus, the Court concluded that Plaintiffs' Second Amended Complaint sufficiently alleged fraud, materially misleading statements or omissions, and scienter as to Cabletron and six of the seven individually named Defendants to survive the Motion to Dismiss.[3]  <u>Id.</u> at 41.  The Court then remanded the case to the district court.  The case was assigned to this writer on December 2, 2002.

---

[3]    The Court dismissed one of the individually named Defendants because the Complaint did not sufficiently connect him to materially misleading statements.

7

The Court of Appeals' opinion suggested that the district court consider structuring discovery so dispositive matters could be considered early on. Accordingly, the Court met with all counsel and devised a schedule to govern staged discovery. Numerous complications and disputes arose resulting in extensive proceedings before Magistrate Judge Robert W. Lovegreen, (see Dkt. No. 44), and numerous lengthy status conferences with this Court. Throughout, Defendants repeatedly sought the names and contact information of Plaintiffs' anonymous sources. Plaintiffs vigorously opposed Defendants' efforts, claiming the sources would be intimidated or dissuaded from testifying. This Court allowed Plaintiffs to withhold this information to provide an incentive for Defendants to continue their efforts to recover data and information necessary to fulfill Plaintiffs' discovery demands. Ultimately, Defendants produced well over one thousand banker's boxes of documents, copies of hundreds of thousands of pages of documents selected by Plaintiffs, ledger documents (in electronic form) comprising several million pieces of data, electronic databases with over a million pages of information, and much more. This process took many months and consumed an enormous amount of attorney time and effort. And, as promised by this Court, Defendants received the right to learn the names of and depose the anonymous sources.

In the late fall of 2004, Defendants contacted and obtained written affidavits from the anonymous sources. To say the least, the information provided in the affidavits was far less incriminating than this Court had been led to believe. Defendants in due course renewed their assault on the Second Amended Complaint by filing a Motion to Strike the anonymous source allegations. As the noose tightened with expected depositions, further discovery obligations, and looming deadlines for objecting to Defendants' Motion to Strike, a settlement was reached. The settlement precluded the need for action on the Motion to Strike and obviated the inevitable confrontation over the quality of the anonymous sources' allegations.[4]

V.  <u>The Settlement and Plan of Allocation</u>

The parties propose a settlement of $10.5 million, plus interest. In addition, Plaintiffs' counsel request attorneys' fees in the amount of 30 percent of the $10.5 million (approximately $3.15 million), and reimbursement for $915,414.01 in out-of-pocket expenses, plus interest from the day the settlement was funded.[5]

---

[4] Defendants, of course, support the settlement but do not concede liability. In fact, Defendants made the point at argument that their insurance policies were "wasting" and had been largely depleted by attorneys' fees, making timely settlement sensible. (In one filing in 2004, Defendants stated that their attorneys' fees as of that date were in excess of $3.5 million. No doubt that number has continued to grow throughout 2005 and 2006.)

[5] Submitted by Plaintiffs' co-lead counsel Milberg Weiss Bershad & Schulman L.L.P, Cohen, Milstein, Hausfeld & Toll,

Plaintiffs' counsel emphasize their belief that the settlement, reached through arm's length negotiations, is fair, reasonable, adequate, and in the best interests of the class, particularly given the significant obstacles to recovery outside of a settlement.

A.   <u>Plan of Allocation</u>

Defendants have paid the $10.5 million into escrow.  Thus, the Net Settlement Fund to be distributed to class members will consist of the $10.5 million plus interest, less all taxes and approved attorneys' fees and expenses.

Plaintiffs' counsel formulated a Plan of Allocation for the Net Settlement Fund "with the goal of reimbursing class members in a fair and reasonable manner."  Under the Plan, each "similarly-situated authorized claimant" who submitted valid Proofs of Claim by September 19, 2005 will receive a pro rata share of the Net Settlement Fund as "determined by the ratio that an authorized claimant's allowed claim bears to the total allowed claims of all authorized claimants."

In determining each claimant's pro rata share, the strengths and weaknesses of the claims of the various types of class members will be evaluated, and recovery will be allocated "in accordance

P.L.L.C., Stull, Stull & Brody, and Plaintiffs' liaison counsel, Little, Medeiros, Kinder, Bulman & Whitney P.C.

10

with Plaintiffs' theories of damages in the action." (Jt. Decl. ¶ 77-78.) Because the lawsuit alleged that Defendants' fraud caused class members to pay more for Cabletron securities than they were actually worth, class members will receive a smaller share of the settlement if they sold their securities while Cabletron's stock prices were still artificially inflated.[6]

Plaintiffs' claims administrator, the Garden City Group ("GCG"), notified potential class members of the settlement by widely distributing claim packets containing the Notice of Settlement and a Proof of Claim form.  The notice described the Plan of Allocation and informed class members that Plaintiffs' counsel would seek a fee of no more than one-third of the Gross Settlement Fund, approximately $1 million in expenses, and a proportionate share of the interest earned by the Settlement Fund. In all, GCG disseminated 75,102 Claim Packets.[7]  Additionally, on June 2, 2005, GCG published a summary of the Notice in the national edition of The Wall Street Journal, and on November 27, 2005, GCG posted the Notice and Proof of Claim form on its website, and

---

[6]  The Joint Declaration sets forth the various formulas for class members who bought common stock or call options or sold put options at various times in the class period.  (See Jt. Decl. ¶ 79.)

[7]  The claim packets were distributed to 4,189 transferees of Cabletron stock and 2,793 of the largest brokerage firms, institutions, banks and other nominees maintained in a GCG database.  GCG also responded to 16,144 bulk requests for claim packets from brokers and other nominee holders to forward to their clients.  (Fraga Aff. ¶ 2-4, 7-8; Pls.' Mem. 14-15.)

implemented a toll-free interactive voice response system to assist potential claimants.[8]

No objections to the settlement or counsel's fee and expense requests were received, although three class members sought to opt-out of the class.[9]   (Fraga Aff. ¶ 10; Pls.' Mem. 12.)   As previously noted, this Court granted preliminary approval of the Settlement and Plan of Allocation, and reserved final approval and certification of the class until resolution of the attorneys' fee issue.   The Court now finds that the Settlement and Plan of Allocation submitted by the parties is reasonable; therefore, the Motion for Class Certification will be granted and the Settlement and Plan of Allocation will be approved.   Motions for attorneys' fees and reimbursement will also be granted in the amounts set forth at the conclusion of this Memorandum and Order.

---

[8]   The system had received 608 calls by August 15, 2005, and GCG has responded to the 119 messages and/or requests for assistance it received from potential claimants. (Fraga Aff. ¶ 5.)

[9]   GCG received two requests for exclusion from the class before the August 1, 2005 deadline, and one request for exclusion postmarked one day after that deadline. (Fraga Aff. ¶ 10.) One of the class members who sought to opt-out of the class, Mr. Thomas Scherer, alternatively objected to both the settlement and award of attorneys' fees. Pls.' Mem. 12. Plaintiffs argue, however, that because Scherer has sought to exclude himself from the class, he lacks standing to file an objection. Id. (citing In re Sunrise Sec. Litig., 131 F.R.D. 450, 459 (E.D. Pa. 1990)). Furthermore, Plaintiffs assert that Scherer's objection "should not weigh against approving any aspect of the Settlement" because it "is essentially a bare-boned attack on class action attorneys." Id.

B.   Attorneys' Fees

Plaintiffs' counsel represent that they have spent more than seven years and 22,300 hours of professional time prosecuting and settling this case on a wholly contingent basis.[10]   (Pls.' Mem. at 1.)   Plaintiffs' counsel argue that the 30 percent fee, which in this case means approximately $3.15 million, is "fair, reasonable, and appropriate," approximates what counsel would have received had the private market determined the fee, and is within the range of attorneys' fees that courts in the First Circuit have awarded in similar high-risk class action cases.   Id. at 1-4.   Additionally, counsel seek $915,414.01 in "reasonable, necessary, and directly related" expenses, "all of which are the sorts of expenses for which 'the paying, arms' [sic] length market' reimburses attorneys."   Id. at 17 (quoting In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 570 (7th Cir. 1992)).[11]

---

[10]   Plaintiffs' counsel list the following tasks they have performed in the course of the seven-year litigation:  pre-filing investigation; drafting the Consolidated Amended Class Action Complaint and the Second Consolidated Amended Class Action Complaint; opposing Defendants' motions to dismiss; appealing the dismissal of the case to the Court of Appeals; analyzing and reviewing extensive documents, including e-mail and other electronic data; consulting with experts on relevant accounting principles; engaging in arm's length settlement negotiations; and drafting the final settlement papers presented to the Court and the Settlement Notice presented to class members.  (Pls.' Mem. at 1-2.)

[11]   The Court challenged numerous expenses contained in Plaintiffs' original submission.  As a result, Plaintiffs modified their reimbursement request to reflect the removal of various questionable items such as multiple filing fees and premiums on administrative expenses.  The amount described in this Order is the

13

Plaintiffs' counsel argue that because the lodestar approach to determining attorneys' fees can prove burdensome and provide perverse incentives, the Court of Appeals has approved the percentage of fund (POF) method of calculating attorneys' fees in common fund cases. Id. at 4-5 (citing In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995)). In Thirteen Appeals, the Court of Appeals did not prescribe the method to be used by district courts to determine the appropriate POF, but instead emphasized the district court's broad discretion in completing that task.

To justify their request, Plaintiffs' counsel first argue that the fees awarded in class actions should approximate the one-third contingency fees normally contracted for in the private marketplace in non-class action cases. (Pls.' Mem. at 5 (citing Blum v. Stenson, 465 U.S. 886, 904 (1984) (Brennan, J., concurring))). Further, they argue that an award of 30 percent of the Gross Settlement Fund is consistent with First Circuit class-action cases similar to the one before this Court. In Thirteen Appeals, for example, the Court of Appeals affirmed the District Court's award to plaintiffs' counsel of approximately $68 million, or 31% of a $220 million common fund. Id. at 5. Counsel also cite numerous district court securities class actions where district courts in

---

amended request.

the First Circuit awarded counsel one-third of the common fund. Id. at 5-6.

Next, Plaintiffs' counsel outline several factors specific to this case to support their fee request: they point out that the $10.5 million Cabletron settlement "is vastly greater than the $5.8 million median recovery for all § 10(b) class actions that have settled since the passage of the PSLRA"; that its "skill and efficiency" in prosecuting an extremely complex securities class action against defense counsel with "a national reputation . . . in securities class action litigation" should bolster its claim; and that in shouldering a huge risk of non-payment for more than seven years, it has served the public interest by providing recovery for small individual claimants who would otherwise have "lack[ed] the resources to litigate a case of this magnitude."

Finally, Plaintiffs argue that a lodestar/multiplier analysis as a cross-check on the POF method reveals that the requested 30 percent award is reasonable. In this case, Plaintiffs' numerous lawyers collectively logged 22,397 hours of professional time for an aggregate lodestar of $8,057,300.50. Thus, Plaintiffs argue that the $3.15 million requested is less than half of the attorneys' cumulative lodestar and further proof that the request is reasonable.

VI.   <u>Methodology for Determing Attorneys' Fees</u>

A.   <u>Percentage of Fund or Lodestar?</u>

In <u>Thirteen Appeals</u>, the Court of Appeals made clear that a district court has the discretion to award fees in a common fund case "either on a percentage of the fund basis or by fashioning a lodestar." <u>Id.</u> at 307.  The POF method, simply put, establishes a percentage of the settlement, to be deducted from the common settlement fund, to compensate the attorneys for their efforts. The POF method has emerged in the last decade-plus as the preferred method of awarding fees in common fund cases.  As the First Circuit has noted, the POF method has distinct advantages over the lodestar approach.  <u>Id.</u>  The lodestar method, which held sway in the 1970s and 1980s, has fallen into disuse in recent years.  The lodestar method multiplies the hours reasonably spent by counsel by either a single blended hourly rate or several such representative rates for partners, associates, and paralegals, for example, to arrive at a reasonable fee.  The hourly rates, which presumably reflect the market, and the fee amount may be adjusted by applying a multiplier reflecting the difficulty of the case, risk, the length of time the case has taken to settle, and other similar considerations.  In either case, the fee award is deducted from the common settlement fund.  <u>See</u> <u>generally</u> Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237 (1985).

The Third Circuit's 1985 Task Force Report describes many of the problems inherent in the lodestar approach, including, to name a few, increased judicial workload; inconsistent application; potential for manipulation; reward of wasteful and excessive attorney effort; disincentive to settle early; and confusion and lack of predictability in setting fee awards. Id.

The POF method is preferred in common fund cases because "it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 333 (3d Cir. 1998)). This is something the lodestar method cannot do.

While most courts have shifted away from the lodestar approach toward the POF method, it is now common practice to use the lodestar as a cross-check on the POF award. Recently, the argument has been made that using the lodestar cross-check is not merely a good practice but an "ethical imperative." See Vaughn R. Walker & Ben Horwich, The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings about "Reasonable Percentage" Fees in Common Fund Cases, 18 Geo. J. Legal Ethics 1453 (Fall 2005).[12] The Court

---

[12] Another recent paper, Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004) (hereinafter, "Eisenberg and Miller"), appears to reject the lodestar cross-check

is persuaded, based on the holding of <u>Thirteen Appeals</u> and the emerging trend in district courts nationwide, that the better approach to awarding attorneys' fees is the POF method. A lodestar cross-check may also be useful; however, it is unclear to this Court where the precise lines of "reasonableness" would be drawn if the lodestar cross-check was mandatory (Is .5 too low? Is 2.5 too high?). <u>See</u> <u>In re Comdisco Sec. Litig.</u>, 150 F. Supp. 2d 943, 948 n.10 (N.D. Ill. 2001). This Court is not required to decide whether the cross-check is an ethical imperative, nor to define the parameters of lodestar reasonableness; rather, it is sufficient to conclude that when the lodestar cross-check is applied to the fee award in this case, it raises no reasonableness concerns.

---

as a tool for determining reasonableness of a fee award. The authors of this thorough study contend empirical evidence suggests that the POF method, scaled downward to reflect the increase in award size, measured within one or two standard deviations of the mean, is a better approach. The Eisenberg and Miller study is compelling, but does not address the ethical side of the equation discussed by Walker and Horwich. Moreover, this approach seems to lend itself to manipulation by counsel. (Eisenberg and Miller suggest that if the fee request is within one standard deviation of the mean, it should be automatically approved; if within two standard deviations, it should be examined for risk, <u>i.e.</u>, whether the case was appealed, etc.) Clever counsel, however, could easily plot a fee percentage at the high end of one standard deviation above the mean and submit that number knowing it would be automatically approved. Moreover, this approach would have the effect of ratcheting the mean upward over time. The Eisenberg and Miller approach, while useful in other respects (see below), is perhaps, in this regard, too scientific in a field that seems to be as much art as science.

B.    Determining the Reasonableness of the Fee

1.    Methodology

This Court's task is deceptively simple:  establish a precise percentage of the common fund that represents a reasonable fee in this case.  Plaintiffs' counsel contend that its 30 percent/$3.15 million fee request is reasonable and common in securities class actions, and reflects what would have been contracted for in the private marketplace.  For support, Plaintiffs' counsel rely primarily upon numerous examples in which district courts have awarded fees in this percentage range.  Contrary to this claim, however, these examples do not accurately reflect actual experience (or the marketplace) in any statistically significant way; rather, they are merely anecdotal examples of cases in which courts have awarded a fee of 30 percent.  For the reasons discussed below, this Court rejects the common practice of reflexively awarding 30 percent (and calling this market-based).  This practice mislabels the award as "market-based" and arguably abdicates a district court's obligation to carefully examine the fee request for reasonableness.

With no adversary to challenge Plaintiffs' proposal, the Court has been left to fend for itself in crafting an approach for assessing reasonableness.  The First Circuit has not mandated a specific approach, but leaves the determination of a methodology to the sound discretion of the district court.  At least three

19

distinct approaches have emerged from other circuit courts. Presumably, a district court in the First Circuit may adopt any one of these, a combination thereof, or another approach, so long as the methodology results in a reasonable award. As a starting point, it is important to recall that in determing reasonableness, the district court acts as a fiduciary to the class. See Fed. R. Civ. P. 23(h) advisory committee note ("[a]ctive judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process . . . . [e]ven in the absence of objections"); In re Rite Aid, 396 F.3d at 307 (when determining fees, judges "must protect the class's interest by acting as a fiduciary").

### a. Multi-Factor Approach

The first common approach to determing the fee award is to apply a multi-factor test. This approach has been adopted, in varying forms, by the Second, Third, Fourth, Fifth, Sixth and Eleventh Circuits. Within this group, the Second, Third and Sixth Circuits utilize six or seven factors, while the others largely employ the twelve factor analysis contained in the seminal lodestar case of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974).[13] The approach of the Second, Third and

---

[13] The Johnson factors are: (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorney due to acceptance of the case; (5)

Sixth Circuits appears to simplify and synthesize the <u>Johnson</u> factors; in contrast, the Eleventh Circuit expands upon them with five factors to be considered in addition to the twelve <u>Johnson</u> factors.[14]

As Judge Hornby recently pointed out in his detailed analysis in <u>Nilsen v. York County</u>, 400 F. Supp. 2d 266, 273-76 (D. Me. 2005), it is plain to see that the multi-factor tests adopted by the various circuits largely overlap. All of the tests include a comparison to the lodestar (time and labor), some consideration of complexity and difficulty of the case, the quality of representation, and the benefit obtained for the class as reflected by the size of the fund, as well as an accounting for the risk associated with the contingency nature of the case. The Third Circuit and the three <u>Johnson</u> Circuits specifically include a

customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation and ability of the attorneys; (10) "undesirability" of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717-719.

[14] The Eleventh Circuit's additional factors are:

[1] time required to reach a settlement, [2] whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, [3] any non-monetary benefits conferred upon the class by the settlement, [4] . . . the economics involved in prosecuting the class action . . . [and 5] factors unique to a particular case.

<u>Camden I Condo. Assoc., Inc. v. Dunkle</u>, 946 F.2d 768, 775 (11th Cir. 1991).

comparison to awards in similar cases.[15]   The Third Circuit and Eleventh Circuit also look to whether there are objections to the fee award.[16]

### b. 25 Percent Benchmark

The second common approach, adopted by the Ninth Circuit, applies a benchmark of 25 percent from which a deviation is permitted upon consideration of various case specific factors. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047-48 (9th Cir. 2002) (citing Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989)).   The Eighth Circuit and the District of Columbia Circuit have not specifically endorsed an approach, but have pointed to "benchmark" percentage ranges to justify reasonableness of particular fee awards.   See Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir. 1999) (twenty-four percent fee found reasonable by citing 1985 Task Force Report's proposition that fees in the range of 20 to 25 percent are reasonable); Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n, 3 F.3d 1568, 1575 (D.C. Cir. 1993) (fee found reasonable in part because it

---

[15]   The Third Circuit suggests that this comparison is one of the most important factors to be considered. See In re Rite Aid, 396 F.3d at 301.

[16] Additional factors worth noting include the Second Circuit's "public policy" factor and the Sixth Circuit's requirement of "maintaining the incentive for future lawyers."   The Johnson Circuits discuss the "undesirability" of the case and the "preclusion of employment factors."

"falls well within the range usually awarded in common fund cases,"
20 percent to 30 percent). This approach, of course, has the
appeal of simplicity and consistency. More importantly, it appears
to recognize the reality that most district judges, utilizing a
multi-factor approach and looking back at a case from the vantage
point of years of hindsight, really have no idea whether a fee
award should be 20, 25, or 30 percent. Instead, the judge picks a
percentage that intuitively seems correct and argues back to it
using the various factors as justification. The Ninth Circuit's
benchmark rejects this in favor of a presumptively reasonable
figure.

### c. Market Mimicking Approach

The Seventh Circuit has adopted a third method for analyzing
reasonableness: the "market mimicking approach." This method is
designed to award a fee that is the "market price for legal
services, in light of the risk of nonpayment and the normal rate of
compensation in the market" at the outset of the case. In re
Synthroid Mktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001). The
Seventh Circuit opines that reasonableness is not an ethical or
philosophical question, and "it is not the function of judges in
fee litigation to determine the equivalent of the medieval just
price. It is to determine what the lawyer would receive if he were
selling his services in the market rather than being paid by court
order." In re Cont'l Ill., Sec. Litig., 962 F.2d at 568. This

23

emulates the incentives present in a private-client attorney relationship, primarily, that the market prices should take into account "the risk of nonpayment," "quality of . . . performance," "the amount of work," and "the stakes of the case." <u>Nilsen</u>, 400 F. Supp. 2d at 276 (citing <u>In re Synthroid</u>, 264 F.3d at 721). The Seventh Circuit has fundamentally rejected the multi-factor "consider everything" approach by emphasizing that it "assures random and potentially perverse results." A "list of factors without a rule of decision is just a chopped salad." <u>In re Synthroid</u>, 264 F.3d at 719.

The Seventh Circuit, however, has also acknowledged that its approach presents particular challenges when a fee award is determined at the completion of the case. For example, because there is no contractual agreement between the lawyers and their clients, no definitive source exists for determining what the market would have yielded had a fee arrangement been negotiated at the outset.[17] Obviously, hindsight regarding the time involved in the case, the problems associated with discovery, the difficulty with witnesses, the passage of time, the litigation of appeals, and

---

[17] Plaintiffs' counsel seem to suggest that the 30 percent fee is the market-standard to which the Court should turn. But, as will be discussed below, this is not true. The reality is that when lawyers compete for business in a real market, proposals are usually far more complex and sophisticated, and yield fee arrangements significantly below 30 percent.

so forth, simply cannot be known up front, but must be somehow factored in at the time the fee award is determined.

Judge Hornby recently provided a thoughtful review of these three approaches in <u>Nilsen</u>. First, he rejected what he called the "path of least resistance," which is the application of the multi-factor approach adopted by the majority of the circuits. As he observed, this approach could support virtually any percentage fee award between 16 percent and 33 1/3 percent. <u>Nilsen</u>, 400 F. Supp. 2d at 277. Because the multi-factor test can support such a broad range of awards, it proves unprincipled. Any method of analysis that can equally support a fee award of 16 percent, 20 percent, 25 percent, 30 percent or 33 1/3 percent,

> is not a rule of law or even a principle. Instead, it allows uncabined discretion to the fee awarding judge. A judge who likes lawyers and remembers the hazards of practice can be generous; a judge who cares more about public reaction or who never used contingent fees in practice can be stingy. It is difficult to contradict the judge's statement about the case's complexity or lack thereof, the difficulties of discovery, the quality of lawyering, etc. These are all highly subjective judgments.

<u>Id.</u>

Judge Hornby also pointed out that the multi-factor approach is at odds with the principle behind the POF method. That is, the POF method directly aligns the interests of the attorneys and the interests of the class (the higher the recovery for the class, the higher the percentage for the attorneys). Applying a multi-factor

analysis to the percentage, which could result in adjustments downward for any number of reasons, chips away at this alignment of interests. Further, the multi-factor analysis leads to the consumption of significant attorney and judicial resources, effectively the same considerations responsible for the rejection of the lodestar approach in favor of the POF method. See Thirteen Appeals, 56 F.3d at 307 (lodestar method more "burdensome to administer" than the POF method).

In contrast, the Seventh Circuit's market-oriented approach does not suffer from these infirmities: the market-mimicking approach allows a court to craft a fee award approximating the result of an arm's length negotiation in real market conditions. Judge Hornby notes that any consumer attempting to determine a reasonable fee for a plumber, mechanic, or dentist would look to the market; further, the market price implicitly is the standard that a jury uses in awarding damages that include reasonable medical expenses in personal injury cases. Nilsen, 400 F. Supp. 2d at 278. Multi-factor tests are not used in these every day situations and therefore should not be used in determining attorney fee awards.

This Court agrees with Judge Hornby's analysis in Nilsen and concludes that the best way to determine the reasonableness of a fee award is to assess what the fee arrangement would have been had it been determined by an open, competitive process at the outset of

the case.[18]   In spite of the limitations associated with a market

based analysis, it is apparent to this Court that this approach is

far more preferable than a subjective multi-factor approach, or a

blindly applied fixed percentage.[19]

The obvious next question is how does a court go about

determining what a market rate fee arrangement would have been at

the outset of a class action case.   This Court has identified two

sources of information.   The first is research data analyzing fee

awards in other class action, non-fee shifting cases (including

securities cases) where fees were awarded at the end of the case.

---

[18]   The obvious difficulties associated with this approach lie
in determining what fee the market would yield after the fact; a
task that is, at best, a matter of estimation.   Moreover, it has
been argued that, in this context, judges have become the market.
See Judith Resnik, Money Matters:  Judicial Market Interventions
Creating Subsidies and Awarding Fees and Costs in Individual and
Aggregate Litigation, 148 U. Pa. L. Rev. 2119, 2129 (2000) (arguing
that judges have "the power of payment" in aggregate litigation and
thus alter the demand and supply pattern by directing capital to
subsidiary service providers and shape lawyers incentives and
market positions, and that as a result attorney fee awards should
be subject to stronger regulation).   For this reason, as discussed
below, the Court will look to the body of research that analyzes
what courts have actually awarded in non-fee-shifting class actions
cases to help pin-point the "market rate."

[19]   It is worth pausing to note that the market-mimicking
approach is a hotly debated topic between the Seventh Circuit
(which demands it) and the Third Circuit (which essentially rejects
it).   See Report of the Third Circuit Task Force on Selection of
Class Counsel, 208 F.R.D. 340, 416 (2002); In re Cendant Corp.
Prides Litig., 243 F.3d 722, 735 n.18 (3d Cir. 2001).   The First
Circuit has taken no position on the use of a market mimicking
approach to reasonableness; this Court finds that utilization of
the approach fits well within the scope of the district court's
discretion acknowledged in Thirteen Appeals.

The second is the group of class action cases in which courts have set the fee at the beginning of the case by a competitive process. From this information, it is possible to estimate what the fee award would have been in this case had it actually been negotiated in advance. By combining the conclusions drawn from these two data sources, the Court is able to arrive at a POF fee award that is well grounded in market-based information and is, therefore, reasonable.

### 2.   Applying the Methodology

In the last twelve years, there have been several comprehensive studies evaluating fee awards in class action cases. One recent study analyzed 1120 class actions of all varieties, with a heavy sampling of securities class actions. See generally Stuart J. Logan et al., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003) (the "Logan Study" or "CAR"). The Logan Study found that, across the spectrum of class action cases, on average, attorneys' fees (plus judicially awarded expenses) equaled 18.4 percent of the settlement fund. A study published four years earlier conducted by an economic consulting firm, National Economic Research Associates, traced fees in securities class actions exclusively. See Denise M. Martin et al., Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions, 5 Stan. J. L. Bus. & Fin. 121, 141 (1999) (the "NERA Study"). Examining data gathered over a number of years, the NERA

Study concluded that fee awards averaged approximately 32 percent of the settlement. 1996 saw the publication of two studies. One, conducted by the Federal Judicial Center, surveyed all class actions terminated in four federal district courts between July 1, 1992 and June 30, 1994. See Thomas E. Willging et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules, 72 (1996) (the "Willging Study") (a version published sub nom. An Empirical Analysis of Rule 23 to Address Rulemaking Challenges, 71 N.Y.U. L. Rev. 74, 157 (1996)). The Willging Study indicated that the mean and median fee award was between 24 and 30 percent of the net monetary distribution to the class. The other, carried out under the auspices of the Law & Economics Consulting Group, collected data from upwards of 1280 securities class action cases between April 1988 and September 1996. See generally Vincent E. O'Brien & Richard W. Hodges, A Study of Class Action Securities Fraud Cases, 1988 to 1996 (1996) (the "O'Brien Study") (summarized in Private Litigation Under the Fed. Securities Laws: Hearings Before the Subcomm. on Securities of the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. 46-48, 138-41 (1993)). The O'Brien Study concluded that, in the most recent three years examined (April 1993 to September 1996), the average fee award to plaintiffs' counsel in securities cases amounted to 32 percent of the settlement fund. Finally, a study published in 1994 found that, in securities class

29

actions, the mean fee-plus-costs award represented 26.2 percent of the case recovery. William J. Lynk, <u>The Courts and the Plaintiffs' Bar: Awarding the Attorney's Fee in Class-Action Litigation</u>, 23 J. Legal Studies 185, 194 (1994) (the "Lynk Study").

Parsing all of this data for meaningful information is no easy task. Professor John Coffee of Columbia University Law School, who is widely regarded as an expert in this field, after reviewing these studies has concluded: "In securities class actions, the average fee award appears to be over 30 [percent]." <u>See</u> Declaration of John C. Coffee, Jr., (cited in <u>In Re VISA Check/Mastermoney Antitrust Litig.</u>, 297 F. Supp. 2d 503 (S.D.N.Y. 2003)); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>In Re Rite Aid Corp.</u>, 146 F. Supp. 2d 706 (E.D. Pa. 2001). However, Eisenberg and Miller in their recent analysis in the Journal of Empirical Legal Studies reached a different conclusion. <u>See</u> <u>supra</u> note 12. Eisenberg and Miller compiled and analyzed the data contained in all previous studies of class action fee awards. In summary, Eisenberg and Miller determined that the median fee in securities class actions is 25 percent, while the median fee in non-securities common fund cases is 20 percent. Thus, the authors concluded that the total data reveals that "in non-fee shifting cases, the axiomatic one-third fee is inaccurate; a fee of 20 to 25 percent of the recovery better described reality." 1 J. Empirical Legal Stud. at 50. Moreover, Eisenberg and Miller further conclude that, as a group, securities

class action fee awards have a higher mean than other non-fee shifting, common fund cases, (between 26 and 27 percent appears to be the range, based on the more recent data). _Id._ at 51, Table 1.

None of the studies clarify why securities class actions yield higher fee awards than other class actions, or whether the passage of the PSLRA has had any effect on fee awards. Eisenberg and Miller claim that the data is ambiguous. Their data suggest post-PSLRA fee awards are higher to a significant degree, while the CAR data suggests the opposite. _Id._ at 56. Whatever the case, the more important question may be whether the PSLRA _should_ have an effect one way or another, and whether there is any other reason to distinguish securities cases from other class actions for purposes of establishing a benchmark. There is no indication in the PSLRA one way or the other, nor is there any legislative history on this point.

The discussion above only begins to scratch the surface of the vast body of statistical analysis available regarding attorneys' fee awards in complex class actions, and securities cases in particular. And this Court is without the technical expertise or time to parse the available data any further. It is enough for present purposes to say that considerable authority (both statistical and judicial) exists to support a finding that the prevalent percentage attorney fee awards range from a low of around 20 percent (for the combined group of all non-fee shifting, class

actions) to a high of between 25 to 30 percent for securities cases (depending on which data source is used).   So if one views past awards as reflective of the market, and if one assumes that the analysis should be limited to the subset of securities cases (as opposed to all cases), and if one credits the recent study by Eisenberg and Miller which aggregates the available data in the field, then it is fair to conclude that 26 percent is the fee Plaintiffs would have negotiated with their attorneys, prior to the commencement of this action if they were limited to an across-the-board percentage fee structure.[20]

Looking only to past POF fee awards alone, of course, does not accurately reflect what the parties would have agreed to if they had negotiated a fee up-front, because it incorrectly assumes that the parties would have negotiated an across-the-board percentage. See Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000) (identifying deficiencies in use of lodestar and POF in failing to replicate the free market for legal services).   There is no reason to believe this is what the parties would have done, and in fact,

---

[20] Interestingly, the Milberg Weiss firm proposed a 25 percent fee in a competitive bid situation in In re Wells Fargo Sec. Litig., 157 F.R.D. 467 (N.D. Cal. 1995).   This is worth noting because, based on the various bids, the case appears to have had a value similar to the present case (around $10 million); with costs included, the bid was around 28 percent.   A similar bid was submitted by Milberg Weiss in In re Amino Acid Lysine Antitrust Litig., 918 F. Supp. 1190, 1199 (N.D. Ill. 1996), but characterized by the court as inferior.   Thus, a 26 percent figure seems quite close to what counsel in this case have in the past perceived to be the market rate when it was forced to compete.

experience indicates otherwise.  When parties are able to negotiate freely _before_ a case is filed, or early in the case, then fee arrangements are much more tailored.

This Court has surveyed the published opinions in cases that utilized a competitive approach to arrive at a fee structure at the outset of a case.  The findings of that survey are set forth in the chart below.[21]  The chart applies the negotiated fee schedule of each case to both the actual settlement reached in the case (if known), and the $10.5 million settlement negotiated in this case. Several observations are readily apparent from this information. First, the POF attorney fee awards are generally lower than the across-the-board POF fee awards discussed above.  This is true whether the actual settlement figure, or the $10.5 million figure is used.  Second, the majority of the fee structures resulting from an early competitive process are more complicated and nuanced than the typical post-settlement, POF awards.  Significantly, these fee structures are tailored to the actual risk/reward evaluation of each case.  Third, the competitive fee structures uniformly reflect a downward scaling as the settlement fund increases.

---

[21]   This chart does not attempt to encompass every district court case that has used a competitive bidding process.  Instead, the chart consists only of bidding cases for which information relating to the fee structure was readily accessible electronically.   The Court is aware that there are other competitive bid cases, but they were not included in this summary because the fee data were not readily accessible.

The summary is as follows:

| CASE AND FEE STRUCTURE | % OF $10.5M RECOVERY[22] | % OF ACTUAL RECOVERY |
|---|---|---|
| **In re Oracle Securities Litigation,** No. 3:90-cv-0931-VRW (N.D. Cal.)<br><br>Recovery     0-12 months     13+ months<br>First $1M      24%         30%<br>Next $4M      20%         25%<br>Next $10M     16%         20%<br>Excess of $15M   12%         15% | 22.86% | 19.2% |
| **In re Wells Fargo Securities Litigation,** No. 3:91-cv-1944-VRW (N.D. Cal.)<br><br>Recovery     < 12 months    > 12 months    Trial forward<br>First $3M      24%        27%        32%<br>Next $7M      22%        25%        30%<br>Excess of $10M   20%        23%        28% | 25.48% | not avail-able |
| **In re Amino Acid Lysine Antitrust Litigation,** No. 1:95-cv-7679 (N.D. Ill.)<br><br>Recovery<br>First $5M      20%<br>Next $10M     15%<br>Next $10M     10%<br>Excess of $25M   no additional fee | 17.38% | 7.78%[23] |

---

[22] This column applies the $10.5 million settlement in this case to the particular fee structures of each bidding case in order to calculate what percentage Plaintiffs' attorneys would have received under that fee structure.

[23] This percentage is based upon the approximated $45 million in "proposed payments in settlement by three of the defendants in this antitrust action," referenced in In re Amino Acid Lysine Antitrust Litig., No. 95 C 7679, 1996 WL 411665, at *1 (N.D. Ill. July 18, 1996).

| CASE AND FEE STRUCTURE | % OF $10.5M RECOVERY | % OF ACTUAL RECOVERY |
|---|---|---|
| <u>Wenderhold v. Cylink Corporation</u>, No. 3:98-cv-4292-VRW (N.D. Cal.)<br><br>| 12.86% | not avail-able |

<u>Wenderhold v. Cylink Corporation</u>,
No. 3:98-cv-4292-VRW (N.D. Cal.)

| <u>Recovery</u> | <u>Pleading -&gt;Motion Dismiss</u> | <u>Post-Dismiss -&gt;Sum. Judgmt.</u> | <u>Post-Sum. Judgmt. -&gt;Trial</u> | <u>Post-Trial -&gt;Final Appeal</u> |
|---|---|---|---|---|
| $0-$500,000 | 10% | 25% | 30% | 35% |
| Next $500,000 | 10% | 17.5% | 25% | 30% |
| Next $4M | 5% | 15% | 17.5% | 20% |
| Next $5M | 5% | 10% | 15% | 12.5% |
| Next $5M | 5% | 7.5% | 12.5% | 12.5% |
| Next $5M | 5% | 5% | 10% | 10% |
| Excess of $20M | 5 | 2.5% | 5% | 10% |

<u>In re Bank One Shareholders Class Actions</u>,
No. 1:00-cv-880 (N.D. Ill.)

| <u>Recovery</u> | | % OF $10.5M RECOVERY | % OF ACTUAL RECOVERY |
|---|---|---|---|
| First $5M | 17% | 14.38% | 6.11%[24] |
| Next $10M | 12% | | |
| Next $10M | 7% | | |
| Excess of $25M | no additional fee | | |

---

[24] This percentage is based upon the settlement figure of $45 million. (<u>See</u> <u>In re Bank One S'holder Class Actions</u>, No. 00-cv-880, Dkt. No. 130 (accessed electronically via PACER)).

| CASE AND FEE STRUCTURE | % OF $10.5M RECOVERY | % OF ACTUAL RECOVERY |
|---|---|---|
| **In re Comdisco Securities Litigation**, No. 1:01-cv-2110 (N.D. Ill.)<br><br>Any sum recovered        7.5% | 18%[25] | 18% |

**In re Quintus Corp. Securities Litigation**, No. 3:00-cv-4263-VRW (N.D. Cal.)

| Recovery | Pleading ->Motion Dismiss | Post-Dismiss ->Sum. Judgmt. ->Trial | Post-Sum. Judgmt. ->Trial | Post-Trial ->Final Appeal | 8.07% | 8.09% |
|---|---|---|---|---|---|---|
| First $4M | 7.5% | 8.5% | 9% | 9% | | |
| Next $4M | 7% | 8% | 8.5% | 8.5% | | |
| Next $4M | 6.5% | 7.5% | 8% | 8% | | |
| Next $4M | 6% | 7% | 7.5% | 7.5% | | |
| Next $4M | 5.5% | 6% | 6.5% | 6.5% | | |
| Excess $20M | 5% | 5.5% | 6% | 6% | | |
| | | | | **MEAN:** | 17% | 11.84% |

Examination of ex-ante fee arrangements resulting from a competitive process indicates, as Judge Walker has noted, that "the

---

[25] Although the original bid set forth a 7.5 percent recovery, after settlement, plaintiffs' counsel petitioned for, and received, a fee equal to 18 percent. Thus, in an effort to be absolutely fair to Plaintiffs' counsel in this case, this Court has decided that the actual recovery of 18 percent should be listed in this column, not the negotiated rate.

25 percent benchmark is often above the level of fees necessary to enlist competent counsel to prosecute securities class actions." In re Quintus Sec. Litig., 148 F. Supp. 2d 967, 974 (N.D. Cal. 2001); see also In re Comdisco Sec. Litig., 150 F. Supp. 2d 943, 947 n.7 (N.D. Ill. 2001) ("[T]his Court's prior experience as well as the bidding results in the present case confirm that the cited mythic norm [of 25 percent to 35 percent] is grossly excessive even where substantially smaller [than $100 million] amounts are at stake."). Although not perfect,[26] it is plain from the experience of the judges who have utilized competitive bidding that it generates lower POF fee arrangements from highly respected counsel, returning substantial value to the class without sacrificing quality of representation.[27]

This Court has no doubt that had a fee arrangement been negotiated in advance in this case, and if a competitive bid

---

[26] Certainly, competitive bidding has faced criticism, primarily from the Third Circuit. See, e.g., In re Cendant Corp. Litig., 264 F.3d 201, 273 (3d Cir. 2001) ("Because a court-ordered auction involves the court rather than the lead plaintiff choosing lead counsel and determing the financial terms of its retention, this latter determination strongly implies that an auction is not generally permissible in a Reform Act case, at least as a matter of first resort."); see also 2002 Report of the Third Circuit Task Force. Proponents in the Seventh Circuit and the district judges such as Judge Walker argue compellingly that competition increases value to the class without sacrificing quality.

[27] Perhaps, as Judge Shadur has commented, the bidding cases will eventually yield enough data to constitute a new norm at far lower percentages at some future point. Comdisco, 150 Fed. Supp. 2d at 951. The above summary may be a start.

process had been used, then the negotiated fee would have been considerably less than 26 percent. How much less is very difficult to assess ten years after the commencement of the action, particularly where the Court only inherited the case in December 2002.

Turning then to the appropriate attorney fee award, application of the formulas derived from the bidding cases to the 10.5 million settlement of this case yields a mean award of 17 percent. The mean award derived from the various studies discussed in this decision is 26 percent. Having considered at length the import of this data, the Court concludes that a reasonable percentage in this case shall be calculated by averaging the 17 percent figure from the market-based cases with the 26 percent figure derived from the various studies. Therefore, this Court finds that, in light of all the circumstances, a fee award on a POF basis of 21.5 percent, or $2,257,500 is reasonable.[28]

In other cases currently pending before this Court, a similar application of market-based information will be used to set a reasonable fee; in future cases this Court intends to utilize a competitive process to set the attorneys' fee at the outset of the litigation.

---

[28] Applying the lodestar of $8,057,300.50 to this figure yields a lodestar multiplier of slightly less than .3.

VII. <u>Conclusion</u>

It is hereby ordered as follows:

1.    The Motion to Certify the Class pursuant to Rule 23(b) is GRANTED;

2.    The Motion for Final Approval of Class Action Settlement and Plan of Allocation is GRANTED;

3.    Plaintiffs' Motion for Attorneys' Fees is GRANTED in the amount of $2,257,500;

4.    Plaintiffs' Motion for Reimbursement of Expenses is GRANTED in the amount of $915,414.01;

5.    The amounts of fees and expenses shall bear interest at the same rate and from the same date as the Settlement Fund.

ENTER:

_____
William E. Smith
United States District Judge
Date: 10|12|06